**Petition of GULF OIL CORPORATION for Limitation Of or Exoneration From Liability as Owner of THE Tank Vessel GULFSTREAM.**

United States District Court
S. D. New York.

April 6, 1959.

Burlingham, Hupper & Kennedy, New York City, for petitioner, Eugene Underwood and Francis I. Fallon, New York City, of counsel.

Pyne, Brush, Smith & Michelsen, New York City, for claimants, George Garbisi, New York City, of counsel.

PALMIERI, District Judge.

On June 29, 1949, Gulf Oil Corporation filed a petition seeking exoneration from, or limitation of, liability for damages arising out of a collision between its vessel, the Gulfstream, and a United States Coast Guard icebreaker, the Eastwind. The collision, which caused the Eastwind to catch fire, occurred on January 19, 1949, about 45 miles off the coast of New Jersey. With an exception not material here, all claims were filed before November 18, 1949; and by May 2, 1957, all but four claims had been compromised and withdrawn.

On the latter date, and with the consent of the parties then actively interested in the limitation proceeding, the Court ordered, in pertinent part, that limitation of liability be granted, that three of the claimants recover their damages, and that their claims be referred to a commissioner for computation of damages and a report thereon. The fourth claim, that of the United States as owner of the Cutter Eastwind, was disposed of on consent, in the same order.

One of the three claims referred to the Commissioner was compromised and withdrawn after the reference. The Commissioner has filed his Report on the remaining two claims, and the matter is now before me for decision on exceptions to the Report made by each of the claimants [1] and by the petitioner.

### Albert P. Williams

The Commissioner assessed damages arising out of the death of Albert P. Williams, a member of the crew of the Cutter Eastwind, in the following sums: (1) To Williams' Estate: $8,000 for the pain and suffering in which Williams languished from the date of his injury, January 19, 1949, until his death on Janu-

---

1. The Commissioner's Report was filed, and notice of the filing mailed to the parties, on January 6, 1959. Claimants' exceptions were filed January 23, 1959. Petitioner resists consideration of claimants' exceptions on the ground that they were filed too late. Local Rule 25(d) of the Admiralty Rules of this Court requires that "[e]xceptions to the reports of commissioners shall be filed within ten days after service of notice of filing of the report * * *." Both the Admiralty Rules of this Court and of the Supreme Court are silent on the power of the Court to relieve a party from the consequences of a late filing. Although the Federal Rules of Civil Procedure are not applicable to this case, Fed.R. Civ.P. 81(a) (1), 28 U.S.C.A., "the policy laid down in Rule 6(b) * * * is in accordance with the earlier practice of the courts of equity, and the rule of admiralty is no different." Schiavone-Bonomo Corp. v. Buffalo Barge Towing Corp., 2 Cir., 134 F.2d 1022, certiorari denied sub nom. Schiavone-Bonomo Corp. v. Bouchard Transp. Corp., 1943, 320 U.S. 749, 64 S.Ct. 53, 88 L.Ed. 445.

Fed.R.Civ.P. 6(b) empowers the Court, "for cause shown," to permit an act to be done after expiration of the time therefor, "where the failure to act was the result of excusable neglect." This rule would apply to the service of objections to a master's report under Fed.R.Civ.P. 53(e) (2). See Fed.R. Civ.P. 6(b).

The Admiralty Rules do not set forth any details concerning the manner in which time periods are to be computed. Applying the rules set forth in Fed.R. Civ.P. 6(a) and (e), claimants' exceptions were filed three days late. Claimants assert that the reason for this was their belief that the filing of the petitioner's exceptions extended the time within which their exceptions might be filed. Petitioner does not claim that this three day lapse prejudiced it in any way. The accident which gave rise to these claims occurred ten years ago. Under these circumstances, I find that cause has been shown and that the claimants' neglect was excusable, and I will consider their exceptions on the merits.

914

ary 27, 1949. (2) To Williams' personal representative,[2] for distribution to his mother[3] for her pecuniary loss, $10,000, and for distribution to his father for his pecuniary loss, $2,500.

### The Award for Pain and Suffering

Petitioner has excepted to the award for pain and suffering on the ground that it is erroneous as a matter of law. Petitioner argues that the Death on the High Seas Act[4] provides the exclusive measure of damages and that an action for pain and suffering may not be maintained under that Act. Petitioner further argues that, if the Act is not exclusive, no award for pain and suffering may be made, for the general maritime law does not provide for the survival of such an action beyond the death of the injured person.

■ The federal admiralty courts draw upon three sources for the rules of law to be applied in cases brought before them:[5] the "international law merchant which was impartially administered by the several maritime nations of the world;"[6] Congressional enactments;[7] and State law.[8] Regardless of the source of a particular rule of law, it is federal law in the sense that "it derives its whole and only power in this country from its having been accepted and adopted by the United States."[9] The federal government's competence in this area, however, does not preclude resort to State law, for "the maritime law was not a complete and perfect system * * * [I]n all maritime countries there is a considerable body of municipal law that underlies the maritime law as the basis of its administration."[10]

■ Recovery for the pain and suffering in which Williams languished before his death may not be had under the Death on the High Seas Act, for recovery under that Act is limited to "pecuniary loss sustained by the persons for whose benefit the suit is brought."[11] And while petitioner concedes that the maritime law, as applied by the maritime nations,

2. The claim was filed by Williams' mother, who had been issued letters of administration by a Massachusetts Probate Court. Mrs. Williams died in 1956. The record does not reveal whether subsequent letters have been issued. In the interest of bringing this proceeding to a conclusion, however, if subsequent letters have not been issued, the order to be entered herein will provide for payment of the amounts due in the Williams claim into the registry of the Court, to be paid out upon proof of qualification of a representative.

3. Mrs. Williams' claim did not abate upon her death. Van Beeck v. Sabine Towing Co., 1937, 300 U.S. 342, 347–348, 57 S. Ct. 452, 81 L.Ed. 685; The City of Rome, D.C.S.D.N.Y.1930, 48 F.2d 333, 341–342. Cf. Union Steamboat Co. v. Chaffin's Adm'rs, 7 Cir., 204 F. 412, 417, certiorari denied 1913, 229 U.S. 620, 33 S.Ct. 778, 57 L.Ed. 1354.

4. 41 Stat. 537 (1920), 46 U.S.C.A. § 761 et seq.

5. See Gilmore & Black, The Law of Admiralty § 1–16 (1957).

6. Romero v. International Terminal Operating Co., 1959, 358 U.S. 354, 391, 79 S.Ct. 468, 3 L.Ed.2d 368 (Opinion of Mr. Justice Brennan); Panama R. Co. v. Johnson, 1924, 264 U.S. 375, 385–386, 44

S.Ct. 391, 68 L.Ed. 748; American Ins. Co. v. Canter, 1828, 1 Pet. 511, 545–546, 7 L.Ed. 242.

7. Romero v. International Terminal Operating Co., supra, note 6, 358 U.S. at page 361, 79 S.Ct. 474; Panama R. Co. v. Johnson, supra, note 6, 264 U.S. at pages 385–387, 44 S.Ct. at pages 393–394.

8. Romero v. International Terminal Operating Co., supra, note 6, 358 U.S. at pages 373–375, 391, 79 S.Ct. 480, 481, 490, n. 3.

9. The Western Maid, 1922, 257 U.S. 419, 432, 42 S.Ct. 159, 160, 66 L.Ed. 299; The Lottawanna, 1875, 21 Wall. 558, 572, 22 L.Ed. 654; Romero v. International Terminal Operating Co., supra, note 6, 358 U.S. at pages 373, 391–392, 79 S.Ct. 480, 490.

10. Just v. Chambers, 1941, 312 U.S. 383, 390, 668, 61 S.Ct. 687, 692, 85 L.Ed. 903 (footnote omitted).

11. Section 2, 41 Stat. 537 (1920), 46 U.S. C.A. § 762. Decker v. Moore-McCormack Lines, Inc., D.C.D.Mass.1950, 91 F.Supp. 560; Id., D.C.D.Mass.1951, 96 F. Supp. 369, 372. Cf. Tetterton v. Arctic Tankers, Inc., D.C.E.D.Pa.1953, 116 F. Supp. 429. See also United States v. The S. S. Washington, D.C.E.D.Va.1959, 172 F.Supp. 905, 908; Gilmore & Black, The Law of Admiralty § 6–33 (1957).

and adopted in the United States, would grant Williams recovery for his pain and suffering,[12] that law does not recognize the survival of the action for the benefit of his estate.[13]

■ The Commissioner concluded, however, that the admiralty courts would adopt the law of the state of petitioner's incorporation,[14] Pennsylvania,[15] to permit the action to survive. Such adoption is not unusual. "State remedies for wrongful death and state statutes providing for the survival of actions, both historically absent from the relief offered by the admiralty, have been upheld when applied to maritime causes of action. Federal courts have enforced these statutes."[16]

It has been held that a claim for unseaworthiness will survive a seaman's death, if there is a pertinent state statute to effect the survival;[17] and approval for this position has been indicated by the Supreme Court.[18] I can perceive of no meaningful distinction, so far as survival is concerned, between an action for unseaworthiness, and one for negligence.[19]

12. Heredia v. Davies, 4 Cir., 1926, 12 F. 2d 500.

13. Cortes v. Baltimore Insular Line, Inc., 1932, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368.

14. Cf. The Hamilton, 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264. In that case the claims filed were for the pecuniary loss suffered by the decedents' dependents. See The Saginaw and The Hamilton, D.C.S.D.N.Y.1905, 139 F. 906, 910–911, affirmed sub nom. The Hamilton, 2 Cir., 1906, 146 F. 724, affirmed 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264. It was there held that the law of the state of the shipowner's residence, Delaware, would be applied to permit recovery for such a loss, which was not recoverable under the general maritime law. Delaware law also provided that a suit for personal injuries would not abate upon the injured person's death; see In re Clyde S.S. Co., D.C.S.D.N.Y.1904, 134 F. 95, 99, and this fact was noted by the Supreme Court, 207 U.S. 398, at page 402, 28 S.Ct. 133. It seems unlikely that the Court would have applied Delaware's law to permit recovery for the dependants' loss but not apply Delaware's law to prevent abatement. Nor may any meaningful distinction, for purposes here relevant, be made between an abatement statute, such as Delaware's, and a survival statute, such as the one at issue here. See text at notes 34–54, infra. See also, Note 70, Harv.L.Rev. 1095, 1096 (1957).

15. "All causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." 20 Pa.St.Ann. § 320.601.

16. Romero v. International Terminal Operating Co., supra, note 6, 358 U.S. at page 373, 79 S.Ct. 480 (footnotes omitted); and see 358 U.S. at 391, n. 3, 79 S.Ct. at 490, n. 3. See also, note 14, supra.

17. Holland v. Steag, Inc., D.C.D.Mass. 1956, 143 F.Supp. 203.

18. Kernan v. American Dredging Co., 1958, 355 U.S. 426, 430 note 4, 78 S.Ct. 394, 2 L.Ed.2d 382.
The decision in Holland v. Steag, Inc., supra, note 17, and the footnote reference in Kernan, both cite Just v. Chambers, supra, note 10. It was there held that the admiralty courts would apply state law to determine whether an action would survive the death of the tortfeasor. In Just v. Chambers, the accident occurred within the territorial waters of Florida, and petitioner advances this fact as a basis for distinguishing the case. But Just v. Chambers and the case at bar are each admiralty cases, and when the question is whether state law will be applied in an admiralty action, "it would seem not to matter whether the accident happened near shore or in mid-ocean * * *." The Hamilton, supra, note 14, 207 U.S. at page 404, 28 S.Ct. at page 134. The place of the accident does not determine whether state law may apply, but which state law should apply. When the accident occurs within the territorial waters of a state, admiralty will apply the survival laws of that state. Just v. Chambers, supra. When it occurs on the high seas, admiralty may apply the law of the shipowner's residence. The Hamilton, supra, note 14. See text at notes 34–54, infra.

19. In Just v. Chambers, supra, note 10, state law was applied to determine whether negligence actions would survive the death of the tortfeasor. See also, Cox v. Roth, 1955, 348 U.S. 207, 75 S.Ct. 242, 99 L.Ed. 260 (Jones Act [46 U.S. C.A. § 688] suit for negligence survives tortfeasor's death). See note 20, infra.

Nor can I perceive of any reason why the beneficent purposes of the survival statutes, which are in force in almost half the states,[20] should not be applied by the admiralty courts. These courts will, of course, consider the peculiar circumstances of the seafaring world in determining the law to be applied to it;[21] but I know of no reason which would suggest that the maritime tortfeasor's liability for pain and suffering should be ended by the injured person's death, while his landlocked counterpart's is not.[22]

■■■ Finally, I cannot agree with petitioner's argument that the Death on the High Seas Act has preempted the field, and prevents the recovery allowed here. There are two types of liability which may be imposed upon a tortfeasor arising out of a death which his negligent act occasioned. One is for the loss suffered by those who depended upon the decedent for their support. The maritime law recognized no such liability;[23] but the federal admiralty courts recognized such a liability if it was imposed by a pertinent state statute.[24] It is that liability which has been unified by the Death on the High Seas Act, so that state statutes may no longer be applied,[25] for they would be destructive of the desired federal uniformity.[26] But there is a second liability, which is recognized by the maritime law, that is, for damages caused to the injured person himself.[27] The question here is whether this liability survives the death of the injured person prior to the institution of suit. On this question, the Death on the High Seas Act is silent,[28] and there is no basis for hold-

20. Prosser, Torts p. 708–9 (2d ed. 1955). This statement applies to the survival of actions for personal injury. See also Cox v. Roth, 1955, 348 U.S. 207, 210, 75 S.Ct. 242, 244, 99 L.Ed. 260, in which the principle of survival of actions against deceased tortfeasors was termed the result of "advancing civilization and social progress."

21. Cf. Just v. Chambers, supra, note 10, 312. U.S. at page 392, 61 S.Ct. at page 693. See also The Hamilton, supra, note 14, 207 U.S. at page 406, 28 S. Ct. at page 135.

22. This question was stated not to be definitely settled in Taylor v. Atlantic Maritime Co., 2 Cir., 1950, 179 F.2d 597, 598, certiorari denied 1951, 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1350.
Petitioner's suggestion, on the oral argument, that the rule I am here following will cause the withdrawal of the American flag from the seas, Tr., p. 79, would appear to be somewhat hyperbolical. In the first place, the Jones Act provides for survival of the seaman's action. 41 Stat. 1007 (1920), 46 U.S.C.A. § 688; 36 Stat. 291 (1910), 45 U.S.C.A. § 59. And see text at notes 17 and 18, supra. Furthermore, a cause of action for pain and suffering, if commenced before the injured person's death, would not abate upon his death before judgment. See note 28, infra.

23. The Harrisburg, 1886, 119 U.S. 199, 78 S.Ct. 140, 30 L.Ed. 358.

24. The Hamilton, supra, note 14.

25. Middleton v. Luckenbach S.S. Co., 2 Cir., 70 F.2d 326, certiorari denied 1934, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674.

26. Lindgren v. United States, 1930, 281 U.S. 38, 44, 50 S.Ct. 207, 74 L.Ed. 686. Passage of the Death on the High Seas Act did not overturn The Hamilton's principle of applying state statutes in the admiralty courts. It rendered unnecessary application of the principle to actions for dependents' damages.

27. The distinction is recognized in St. Louis, Iron Mountain & Southern R. Co. v. Craft, 1915, 237 U.S. 648, 658, 35 S.Ct. 704, 59 L.Ed. 1160.

28. I do not believe that section 5 of the Death on the High Seas Act, 41 Stat. 537 (1920), 46 U.S.C.A. § 765 bears on this problem. On the oral argument petitioner suggested that this section provides for the survival of the injured person's claim for damages for pain and suffering if he should die while the action is pending. And see United States v. The S. S. Washington, supra, note 11, 172 F.Supp. at pages 908–909. That section, however, provides that, upon the injured person's death, "the personal representative of the decedent may be substituted as a party and the suit may proceed as a suit under this chapter *for the recovery of the compensation provided in section 762 of this title.*" (Emphasis added). Section 762, however, does not permit recovery for the decedent's pain and suffering. See text at note 11 supra; Pickles v. F. Leyland & Co., D.C.D.Mass. 1925, 10 F.2d 371, 372.

ing that this silence is to be interpreted as denying the survival.[29]

Nor can I agree with petitioner's argument that the admiralty courts are without power to adopt the rule I am here following. Such action is traditionally taken by the admiralty courts,[30] and is in fulfillment of their power "to continue the development of this law within constitutional limits."[31] And while uniformity in this field, and Congressional action to accomplish it, would be desirable,[32] "[e]ven Southern Pacific Co. v. Jensen [244 U.S. 205, 37 S.Ct. 524, 61 L. Ed. 1086], which fathered the 'uniformity' concept, recognized that uniformity is not offended by 'the right given to recover in death cases.'"[33]

Accordingly, I confirm the Commissioner's conclusion that Williams' action for pain and suffering survived his death for the benefit of his estate.

Some comment may be appropriate, however, on the doctrinal basis for reaching this result. In The James McGee,[34] Judge Learned Hand had before him death claims brought by the decedents of crew members of a United States vessel which collided, on the high seas, with a vessel owned by a New Jersey corporation. The crew members had died aboard the Government vessel or in the adjacent waters. Judge Hand granted recovery under a New Jersey statute, now N.J.S. A. 2A:31–1, interpreting The Hamilton [35] to teach that the law of the tortfeasor's residence created an obligation to respond in damages to the decedents' dependents, and that the admiralty courts would enforce that obligation. Judge Hand felt that it was an irrelevant fact, in The Hamilton, that the decedents had died aboard a ship belonging to a Delaware resident.[36] He rejected the theory that liability was imposed in The Hamilton on the ground that Delaware law followed the ship, on which the deaths took place, to sea, and that, in consequence, liability was imposed because Delaware was fictionally held to be the *lex loci delicti*. Of course, if Judge Hand's interpretation of The Hamilton

---

"[A] suit in rem against a vessel for personal injuries sustained in a collision does not abate by the death of the libelant." The Lafayette, 2 Cir., 1920, 269 F. 917, 927.

29. United States v. The S. S. Washington, supra, note 11.
The history of the passage of the Death on the High Seas Act is set forth in Judge Goodman's opinion in Wilson v. Transocean Air-Lines, D.C.N.D.Cal. 1954, 121 F.Supp. 85. As Judge Goodman points out, 121 F.Supp. at page 91, the Act should be held to exclude state remedies only to the extent that it affords the same remedy. There is nothing in the history of the passage of the Act, the purpose of which was to provide a uniform right of recovery for dependents' losses, 121 F.Supp. at page 92, to indicate that the accomplishment of its remedial purposes should be construed to cut off other and distinct remedies. It might be argued that Section 7 of the Act, 41 Stat. 538 (1920), 46 U.S.C.A. § 767, preserves the state remedies on the high seas. See however, 121 F.Supp. at pages 90–91.

30. See The Hamilton, supra, note 14.

31. Romero v. International Terminal Operating Co., supra, note 6, 358 U.S. at page 361, 79 S.Ct. 474.

32. Echavarria v. Atlantic & Caribbean Steam Nav. Co., D.C.E.D.N.Y.1935, 10 F.Supp. 677, 678.

33. The Vessel M/V "Tungus" v. Skovgaard, 1959, 358 U.S. 588, 594, 79 S.Ct. 503, 507, 3 L.Ed.2d 524. And see Just v. Chambers, supra, note 10, 312 U.S. at page 392–393, 61 S.Ct. at page 693.

34. D.C.S.D.N.Y.1924, 300 F. 93. This case was not cited by either party, to the Commissioner, or to the Court.

35. Supra, note 14.

36. The James McGee, supra, note 34, at page 96. It appears, however, that the Circuit Court of Appeals, in The Hamilton, applied Delaware law as the *lex loci delicti*. 2 Cir., 1906, 146 F. 724, 726, affirmed 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264. See also, International Nav. Co. v. Lindstrom, 2 Cir., 1903, 123 F. 475, certiorari denied 1904, 193 U.S. 669, 24 S.Ct. 852, 48 L.Ed. 840; In re Clyde S.S. Co., supra, note 14, 134 F. at pages 99–100. See also, Whitelock, A New Development in the Application of Extra-Territorial Law to Extra-Territorial Marine Torts, 22 Harv. L.Rev. 403, 412 (1909).

is applied, *pari passu*, to this case,[37] Pennsylvania law, the law of the instant tortfeasor's residence, may be applied here to work a survival of the claim for pain and suffering. It would be a short path to the same result, which I reach by a more lengthy route.

I must add, however, that I have some difficulties with this view. In the first place, it is contrary to the rule applying to torts committed on land,[38] although the fact that the high seas are *regio nullius* may offer a sufficient explanation of this difference. In the second place, there is some internal evidence, in the Court's opinion in The Hamilton, to indicate that the Court did apply Delaware law because it was the *lex loci delicti*. Thus, the Court referred [39] to "[t]he jurisdiction commonly expressed in the formula that a vessel at sea is regarded as part of the territory of the state * * *." If the theory were that the law of the tortfeasor shipowner's residence placed an obligation upon him, which followed him when he was outside its territory, it would have been unnecessary to consider whether the vessel was a part of that territory. In addition, the Court cited [40] its earlier decision in Slater v. Mexican Nat. R. Co., in which it had said that "the only source of this obligation [to

respond in damages to the decedent's dependents] is the law of the place of the act * * *."[41] This would also indicate that The Hamilton decision turned on a *lex loci delicti* concept as that term is traditionally understood, and that the place where the decedents died was deemed fictionally to be Delaware territory. Applying this theory of The Hamilton case here, the claim for pain and suffering would not survive, because the place of the act [42] was the Cutter Eastwind, and the maritime law, as applied in the federal courts, does not provide for the survival of the action.[43]

There is, however, a theory of the *ratio decidendi* of The Hamilton which proceeds from the admiralty choice of law principle set forth in The Scotland,[44] and reiterated in La Bourgogne,[45] the latter case having been decided only a few months after the decision in The Hamilton. This principle is that the rights and liabilities arising from a collision on the high seas, between vessels which belong to different nations,[46] having different laws, will be determined by the law of the forum, while the law of the flag will apply if the law of each ship is the same.[47] This theory, which has been accepted by the Restatement,[48] explains

37. See note 14, supra.

38. See, e. g., Ormsby v. Chase, 1933, 290 U.S. 387, 54 S.Ct. 211, 78 L.Ed. 378; Restatement, Conflict of Laws §§ 390, 391 (1934).

39. The Hamilton, supra, note 14, 207 U.S. at page 405, 28 S.Ct. at page 134.

40. Id. at loc. cit.

41. 1904, 194 U.S. 120, 126, 24 S.Ct. 581, 583, 48 L.Ed. 900. The citation in The Hamilton, supra, was to this page in the Slater decision. See also, note 36, supra.

42. "Except in case of harm from poison, when a person sustains bodily harm, the place of wrong is the place where the harmful force takes effect upon the body." Restatement, Conflict of Laws § 377, Note 1 (1934).

43. See text at note 13, supra.

44. 1882, 105 U.S. 24, 26 L.Ed. 1001.

45. 1908, 210 U.S. 95, 28 S.Ct. 664, 52 L. Ed. 973.

46. Although The Scotland enunciated the rule in the context of ships belonging to residents of different nations, it must be remembered that The Hamilton taught that the laws of the states of the Union might also apply to ships on the high seas.

47. The Scotland, supra, note 44, 105 U.S. at pages 29-30, 31-32. If the accident occurs within the territorial waters of a state, the law of that state applies. The Scotland, supra, at page 29; Just v. Chambers, supra, note 10; Restatement, Conflict of Laws § 409 (1934). When a death on the high seas does not arise out of a collision, the law of the state of the ship applies. Holland v. Steag, Inc., supra, note 17; International Nav. Co. v. Lindstrom, supra, note 36.

48. Restatement, Conflict of Laws §§ 409, 410 (1934). That the Restatement does

The Hamilton on the basis that both ships involved in that case belonged to Delaware corporations. Application of The Scotland's principle to the present case leads to the result that the question of survival be determined by the law of the forum.

This might result, therefore, in pointing to a denial of the survival.[49] It must be remembered, however, that this is a limitation proceeding, in which the claimants have been forced to litigate their claims here.[50] "Every consideration based on equity and natural justice impels us to hold that it was not the purpose of the limited liability act to enable vessel owners to force claimants into the admiralty, and thus avoid claims which are valid and enforceable at common law. The intent was to limit the liability, not to destroy it." [51] In a limitation proceeding, therefore, the claimant will be permitted to recover if he might have recovered in a common law action in another forum.[52] If the petitioner had been sued in the Pennsylvania courts, the rules of The Scotland and The Hamilton would have caused those courts to apply their own law in determining whether the action for pain and suffering survived. Since survival would be permitted under that law,[53] the limitation forum will pro-

not intend this rule to apply only to the question of whether limitation will be granted is evident both from the wording of the section, and from the fact that limitation is treated in a separate section. Id., § 411. See also, Note, 5 Col.L.Rev. 234 (1905).

49. See text at note 13, supra, and see note 54, infra.

50. See the final paragraph of note 53, infra.

51. The Hamilton, 2 Cir., 1906, 146 F. 724, 727, affirmed 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264.

52. The Hamilton, supra, note 14, 207 U.S. at page 406, 28 S.Ct. at page 135; La Bourgogne, supra, note 45, 210 U.S. at pages 137–140, 28 S.Ct. at pages 679–680; Just v. Chambers, supra, note 10, 312 U.S. at pages 389–392, 61 S.Ct. at page 692–693.

53. I am aware that my conclusion rests on the assumption that the Pennsylvania law would apply to ships owned by its residents while on the high seas. See The Hamilton, supra, note 14, 207 U.S. at page 405, 28 S.Ct. at page 134. The Pennsylvania statute, here at issue, has been held to effect the survival of an action for a maritime tort, where the accident took place on navigable waters within Pennsylvania. Curtis v. A. Garcia Y Cia., 3 Cir., 1957, 241 F.2d 30, 37.

I know of no case which treats with the question of whether this Pennsylvania survival statute was intended to apply on the high seas. In the absence of such a decision, I know of no reason to depart from the common "formula that a vessel at sea is regarded as part of the territory of the state * * *." The

Hamilton, supra, note 14, 210 U.S. at page 405, 28 S.Ct. at page 134. And see id. at loc cit. where the Court said: "If [the Delaware statute] touches any case at sea, it controls this [case arising on the high seas.]" This theory has been termed "strained" and "inappropriate" and its approval by the Supreme Court today has been doubted in a suit for dependents' losses caused by a death on the high seas. Wilson v. Transocean Airlines, supra, note 29, 121 F.Supp. at page 88. See, however, text at notes 25–29, 32 and 33, supra, and see note 29, supra.

The problem settled by the Skovgaard decision, supra, note 33, of the extent to which state law is to be adopted on the merits of the underlying claim, is not present here. For, as recognized in the Curtis case, 241 F.2d at page 37, and as distinguished from the situation present in Skovgaard, 358 U.S. at pages 592–593, 79 S.Ct. 507, the cause of action here is originally given by the maritime law, and state law is relevant only on the question of survival of the remedy. See text at note 27, supra.

Finally, I wish to note the possibility of remitting the parties to the Pennsylvania courts for a determination of the applicability of the Pennsylvania statute in this situation. See The Vessel M/V "Tungus" v. Skovgaard, supra, note 33, 358 U.S. at page 596, 79 S.Ct. at page 508. This procedure has not been suggested by the parties. It would appear to be most inappropriate here, ten years after the accident which gave rise to this proceeding, and where it would tend to enervate the purpose of a limitation proceeding to force adjudication of all claims in one forum, an optional pro-

vide the same remedy. It is by this rea-soning that I apply Pennsylvania law in this case.[54]

█ Claimant excepts to the award for pain and suffering on the ground that it is inadequate. Claimant asserts that it should be raised to $18,000. The Commissioner found that Williams, for the eight days [55] between his injury and his death, "suffered intense pain and suffering from the severe second degree burns of his face, upper extremities, neck, trunk and scattered areas on the lower extremities. In fact, the cause of death was the extensive second and third degree burns of approximately 75% to 80% of the entire body surface."

█ The Commissioner's report is to be treated as "presumptively correct." [56] The claimant's argument is that the intense pain and suffering should be valued at $2,250 per day, rather than $1,000 per day. Such a valuation is not susceptible of precise monetary formulation.[57] Under the circumstances, I can find no proper basis for disturbing this award.

## The Awards for Dependents' Pecuniary Losses

█ Each of the parties attacks the Commissioner's awards, under the Death on the High Seas Act, for pecuniary losses suffered by the decedent's dependents. The petitioner asserts that the award of $10,000 to the estate of the decedent's mother is excessive and that it should be reduced to $2,100. The claimant asserts that the award of $2,500 to the decedent's father is inadequate and that it should be increased to $17,000.

Williams, who was 20 at the time of his death, had joined the Coast Guard upon his graduation from high school. Mrs. Williams testified that her son had intended to study engineering upon release from the service. At the time of his death he had a net monthly income of $76 which, while he was on sea duty, was increased to $92. He had established an allotment to be paid to his mother of $35 per month, denominated on Coast Guard records as a savings allotment, and she testified [58] that he additionally

cedure initiated by the petitioner and forced upon the claimants by it. See Propper v. Clark, 1949, 337 U.S. 472, 486–492, 69 S.Ct. 1333, 93 L.Ed. 1480. The petition for limitation alleged that multiple claims were being asserted and that their aggregate value was more than three times the petitioner's liability under the Limitation Act. The commencement or prosecution of any proceeding against petitioner, arising out of the collision, except in the limitation proceeding, was enjoined. See Gilmore & Black, The Law of Admiralty § 10–17 (1957).

54. Under the reasoning of The James McGee, supra, note 34, Pennsylvania law would apply, regardless of the method by which the case came to this forum. Under the reasoning I have adopted, it is applied here because this is a limitation proceeding. See text at notes 49–53, supra. The result might be different if the suit were here under the diversity jurisdiction, 28 U.S.C. § 1332 (Supp. V), and the saving-to-suitors clause, 28 U.S.C. § 1333(1) (1952). Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

The result might also be different if the case were here as an admiralty action, instituted by Williams' estate as libelant under 28 U.S.C. § 1333(1) (1952).

55. The accident occurred at approximately 4:30 a. m. on January 19, 1949. Williams died on the morning of January 27, 1949 at 11:00 a. m.

56. Admiralty Rule 43½, 28 U.S.C.

57. The claimant herself gives evidence of this fact. The filed exception states that the award should be "increased to the sum of $18,000.00." Claimant's brief states that the evidence before the Commissioner "would amply justify an award of more than $2,500. a day. On the record submitted, the Court should award the sum of $20,000. * * * for the eight days he languished in pain prior to his death." And claimant's brief before the Commissioner urged that the pain and suffering be valued at $5,000.00 per day.

58. Her testimony was received by the Commissioner through a deposition taken before her death. All the evidence before the Commissioner was in the form of depositions and documents.

gave her $25 per month for household expenses. She testified that she had cashed the allotment checks at a neighborhood store; but the petitioner introduced documentary evidence before the Commissioner which showed that a $35 deposit had been made each month from August, 1947 through December, 1948, in a joint savings account which she maintained with her son. This record does not show any other deposits, with the exception of the opening deposits, a $100 deposit in July, 1948, following a $100 withdrawal in June, and a $40 deposit in September, 1948, the day after a $50 withdrawal and a few days after other withdrawals totalling $65. In addition to the withdrawals already noted, the account shows scattered withdrawals totalling $208.

Much has been made of the discrepancies between Mrs. Williams' testimony and the bank records, and of calculations based on the amount of the allotment and the additional payments about which she testified. While the contributions actually made are important in determining the pecuniary loss suffered,[59] they are not conclusive in attempting to arrive at an "exact quantum of pecuniary loss arising from wrongful

death [which] is at best difficult to estimate."[60] Indeed, an award to parents would be justified in the absence of any evidence of contributions on the basis of the reasonable expectation that a child will, at some time in the future, contribute to the support of his parents.[61]

Mrs. Williams' loss, however, may not be valued according to her life expectancy at the time of her son's death (22.6 years), but according to her actual life span from that time (7 years).[62] Nor may interest from the time of death to the time of judgment be allowed.[63] Among the elements to be considered in awarding damages are "[t]he deceased's age, [the possibility that he will marry and thus assume additional responsibilities,] his earning capacity, his surviving beneficiaries, their ages, and his contributions to them, his condition of health, [and] his prospects of advancement * * *."[64]

Taking all of these factors into account, I have determined that the awards for the benefit of Williams' mother and father[65] should be modified so that the award for the benefit of his mother will be decreased to $2,000, and the award for the benefit of his father will be increased to $10,311.45.[66]

59. The City of Rome, supra, note 3, 48 F. 2d at page 338.

60. Civil v. Waterman S.S. Corp., 2 Cir., 1954, 217 F.2d 94, 99. An award for decedent's pain and suffering was made in the Civil case, where suit was brought under the Jones Act and the Death on the High Seas Act. See note 22, supra.

61. Cf. Snyder v. United States, D.C.D.Md. 1953, 118 F.Supp. 585, 592–594, modified and affirmed sub nom. United States v. Guyer, 4 Cir., 1954, 218 F.2d 266, judgment of District Court reinstated, 1955, 350 U.S. 906, 76 S.Ct. 191, 100 L.Ed. 796. Of course, where the deceased had begun to work before his death, his actions in respect to contributions are of greater probative value than a presumption which must be indulged when the deceased had not reached employment age at the time of his death.

62. Van Beeck v. Sabine Towing Co., supra, note 3, 300 U.S. at pages 347–348, 57 S. Ct. at page 454–455.

63. Wyman v. Pan American Airways, Inc., 1943, 181 Misc. 963, 965–966, 43 N.Y.S. 2d 420, 423, affirmed per curiam, 1st Dep't, 267 App.Div. 947, 48 N.Y.S.2d 459, affirmed per curiam, 1944, 293 N.Y. 878, 59 N.E.2d 785, certiorari denied 1945, 324 U.S. 882, 65 S.Ct. 1029, 89 L.Ed. 1432.

64. The City of Rome, supra, note 3, 48 F.2d at pages 337, 340, 344.

65. The award to the father for future losses is discounted to its present value. The City of Rome, supra, note 3, at page 337.

66. While a commissioner's report is presumptively correct, Admiralty Rule 43½, it may be "rejected * * * if the court is satisfied that the evidence so requires." The No. 114, D.C.E.D.N.Y.1935, 13 F. Supp. 210, 211, affirmed sub nom. New England S.S. Co. v. The Tug Turecamo Girls, 2 Cir., 1936, 80 F.2d 1017.

I find that decedent's allotment of $35 per month was not intended or used, in whole, for the support of his parents. The discrepancy in Mrs. Williams' testimony in this regard might lead to the conclusion that her testimony should be entirely rejected. I find, however, on the basis of her testimony, that of the decedent's father and aunt, and the family practice, as testified, of turning over to Mrs. Williams the family's earnings for use in running the household,[67] that the decedent did contribute $25 per month for his parents' support and that this amount was supplemented by a small portion of the funds from the $35 allotment checks. Starting with that figure as a base, and considering the prospects that decedent's earning powers would have increased, I have concluded that decedent would have contributed $4,000 to the support of his family from the time of his death to the time of his mother's death. Since these contributions were for the support of both his parents,[68] I award half this amount, $2,000, for the benefit of his mother's estate.

Williams' father's salary for 1949 was $3,766.08.[69] At the time his deposition was taken in 1956, his earnings were a little over $5,000 per year.[70] He was born in 1894 and is, consequently, now 65. He has no savings and is entitled to no pension.[71] He does not own his home.[72] I find that decedent would have contributed $2,000 for his father's support from the time of his death until his mother's death, and an additional $750 from that time until the present. In addition, I award $400 to decedent's father for lost wages

and living expenses incurred while in New York during the last illness of his son.[73] The award for past damages to the father is, accordingly, $3,150. I further find, on the basis of the factors enumerated above, and especially considering the likelihood of increased contributions to the father in his later years, that decedent would have contributed $750 per year for his father's support from the present time forward. Discounting this sum at 3½%, I award $7,161.45 to the father for his future loss.[74] The total award to the father is, accordingly, $10,-311.45.

### Kenneth S. King

The decedent, King, entered the Coast Guard in 1939, and had advanced to the rate of Chief Petty Officer, at the time of his death at age 28, on January 19, 1949. The Commissioner made two awards:[75] to King's personal representative for distribution (1) to King's sister in the amount of $6,000, and (2) to his nephew in the sum of $7,500. These awards were made under the Death on the High Seas Act for "pecuniary loss sustained."[76] King left no surviving spouse, children, or parents. Petitioner objects to each claim as erroneous as a matter of law, and as excessive. The Estate of King's sister objects to its award as inadequate.

King's net pay, at the time of his death, was $169.65 per month. This figure was increased to $202.65 while he was at sea. King allotted $50 monthly to his sister who had a rheumatic heart disease and who required constant medical

---

67. Deposition of Raymond T. Williams, 34–5; Deposition of Esther L. McNulty, 42.

68. See note 67, supra; and see Deposition of Mary A. Williams, 20.

69. Deposition of Raymond T. Williams, Exhibit 3.

70. Id., page 35.

71. Id., pages 34–6.

72. Deposition of Mary A. Williams, 16.

73. Deposition of Raymond T. Williams, 30.

74. I have used Table II in U.S.Treas.Regs. § 25.2512–5(e) (1958). This table shows the annuity value of $1.00, payable at age 65, and discounted by 3½%, to be $9.5486. Multiplying this figure by 750 gives the sum of $7,161.45.

75. A third claim, on behalf of King's brother, was withdrawn.

76. Section 2, 41 Stat. 537 (1920), 46 U.S.C.A. § 762.

attention and care. He also allotted $30 per month [77] for his nephew, who had a deformed foot which required serious medical operations, and whom he regarded as a "favorite." The Commissioner also found that the decedent wished to assure his nephew's college education.

The legal objections, raised by the petitioner, attacking these awards, are based on its claims that the beneficiaries were not "dependent relative[s]" within the meaning of the Act.[78] This claim is bottomed on the fact that the sister was married and derived most of her support from her husband, and that the nephew was mainly supported by his father. The Act does not define the term "dependent relative," and I find no constructions of it in the reported cases. But I know of no reason to depart here from the general rule, in death cases, that partial dependency is sufficient.[79] Petitioner's attack upon the award to the nephew, on the ground that damages for lost educational assistance may not be had under the Act, is not well taken.[80]

Turning to the amounts awarded, and applying the standards which are set forth above in connection with the Williams' claims,[81] and particularly, in the case of the sister, the fact that she died seven years after her brother,[82] I find that the awards for the benefit of King's sister and nephew should be in the amounts of $4,500 and $7,400.80, respectively. In the case of the allotment to King's sister, each of the $50 checks, from January 31, 1945 through December 31, 1948, was introduced. Almost all of these checks, endorsed by King's sister and, sometimes, her husband also, were then endorsed by the Melrose Trust Co., Melrose, Mass. King's sister maintained two bank accounts, each jointly with King, at that bank. Examination of the records of these accounts, however, shows that only ten $50 deposits were made into these accounts during this period. Various large deposits were also made into these accounts during this period. With a few exceptions, however, these deposits cannot be explained as aggregations of the monthly allotments. At least two of the checks (some of the photostats were not clear enough to permit reading the endorsement stamps) were not cashed at the bank. This documentary evidence is, accordingly, consistent with the Commissioner's finding, which I affirm, that King was assisting his sister with her medical expenses.[83] In this connection, it should be noted that King's sister's husband's gross income, in 1948, was $3,521.-52.[84] In 1956, after his wife's death, it was approximately $5,000.[85] In view of the fact, however, that King's sister lived for only seven years after King's death, the award of $6,000 appears to be excessive, and it is reduced to $4,500.

Turning to the award to King's nephew, photostats of the allotment checks from May 31, 1947 to December

**77.** This allotment began at $20 per month. In November, 1948, it was increased to $30 per month. King's nephew, the award to whom is here in question, is the son of King's brother, John A. King.

**78.** Section 1, 41 Stat. 537 (1920), 46 U.S.C.A. § 761.

**79.** E. g., Wende v. McManigal, 2 Cir., 1943, 135 F.2d 151. Nor is "[t]he pecuniary loss * * * dependent upon any legal liability of the injured person to the beneficiary." Michigan Central R. Co. v. Vreeland, 1913, 227 U.S. 59, 70, 33 S.Ct. 192, 196, 57 L.Ed. 417.

**80.** The City of Rome, supra, note 3, 48 F.2d at page 340. King's sister's lost

medical assistance is also within the intendment of the Act. Id. at pages 342–343.

**81.** See text at notes 59–65, supra.

**82.** See note 3 and text at note 62, supra.

**83.** Twenty of the checks were endorsed by King's sister and her husband. This would indicate that they were not deposited in the joint account of King and his sister.

**84.** See Letter to Mr. Daniel J. Reardon, from the City Auditor of Melrose, dated July 3, 1952, included in King Exhibit 2 to the deposition.

**85.** Deposition of Daniel J. Reardon, 67.

1948, with two exceptions, indicate that these checks were deposited in one of the banks at which the nephew's father said he was maintaining bank accounts for his son's educational fund. The testimony that King was interested in seeing that his nephew received a college education is wholly credible. It is buttressed by the feelings which this unmarried uncle would be likely to have for his deformed nephew, and for the nephew's father, King's brother, who had looked after their parents in their last years.[86] The fact that large deposits were placed in the joint accounts maintained by King and his sister indicates that these were the accounts he maintained for his savings, and that the allotment to his nephew's father, although denominated on Coast Guard records as a "savings" allotment, was not intended for that purpose. The nephew's father's gross income for the years 1948 through 1955 rose from $3,849.92 to approximately $5,700.[87] King's intention to underwrite his nephew's college education was also confirmed by the testimony of a neighbor and friend of the family.[88] King's nephew was a high school sophomore in 1956.[89] He would, accordingly, normally be graduated from college in 1962, at which time the support of his uncle would be expected to end. It appears that it would be reasonable to assume that he would have received $6,000 for his education and for necessary medical attention to his foot, from his uncle, in the ten years between his uncle's death and the present. I also find that he would have received an additional $500 per year for his education[90] in the three years between now and 1962. Commuted to its present value, this expectation is worth $1,400.80.[91] Accordingly, the total award to King's nephew is $7,400.80.

The exceptions are overruled and sustained as indicated above. Settle decree, including taxation of the Commissioner's fee and expenses,[92] by April 13, 1959.

86. See, Deposition of John A. King, e. g., at 12.

87. Id. at 22-3.

88. Deposition of John L. Fenlon, 48 et seq.

89. Deposition of John A. King, 23.

90. His father testified that one more operation was probably required to alleviate, to the extent possible, his son's deformity. Deposition of John A. King, 18.

91. I have used Table II appearing in the Treasury Regulations, supra, note 74. This Table shows the value of an annuity of $1, for a term of three years, discounted at 3½%, to be $2.8016. Multiplying this figure by 500 gives $1,-400.80.

92. The parties stipulated, at the hearing before the Court, that the Commissioner's fee, in the amount of $1,250, was reasonable, and that he is entitled to recover $24 in expenses. Tr., pp. 10-11.