Paulette Boudreaux **RODRIGUE** as the personal representative of Butley J. Rodrigue, bringing this suit for the benefit of Paulette Boudreaux Rodrigue, Angela Rae Rodrigue, and Butley J. Rodrigue, Jr.

v.

The **AETNA CASUALTY AND SURETY COMPANY**, Rubin W. Mayronne, Jr., d/b/a Mayronne Drilling Company, and Humble Oil and Refining Company.

**Adm. No. 810.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

March 27, 1967.

A. Deutsch O'Neal, Sr., Philip E. Henderson, O'Neal & Waitz, Houma, La., for plaintiff.

Alexander C. Cocke, New Orleans, La., for Humble Oil & Refining Co.

Richard C. Baldwin, Joel Borello, Adams & Reese, New Orleans, La., for Humble Oil and Refining Co. and Mayronne Drilling Co.

WEST, District Judge:

Plaintiff's husband, Butley J. Rodrigue, now deceased, was, on March 7, 1964, an employee of Loomis Hydraulic Testing Company. This company was engaged in the business of testing oil well pipes and tubing for leaks or damage. Defendant Humble Oil and Refining Company was the owner of a fixed platform from which a well was being drilled some eighteen miles out from Grand Isle, Louisiana in the Gulf of Mexico. Humble had contracted with the defendant, Rubin W. Mayronne, Jr., d/b/a Mayronne Drilling Company, to drill this well for them. Humble also contracted with Loomis to perform the testing services needed at the proper time during the drilling operation. While in the course of his employment with Loomis, and while in the process of preparing to test the pipes and tubing of Humble's well, Butley J. Rodrigue fell from the derrick to his death. Plaintiff, the widow of the deceased, filed suit on her behalf and on behalf of her minor children, contending that both Humble and Mayronne were guilty of negligence proximately causing the death of her husband, Butley J. Rodrigue. She initially brought three suits, one based upon the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 et seq., one for wrongful death under Article 2315 of the Louisiana Revised Civil Code, and this suit under the provisions of the Death on the High Seas Act, 46 U.S.C.A. § 761 et seq. This Court dismissed the first two suits and allowed plaintiff to proceed on the admiralty side of the Court under the Death on the High Seas Act.

After hearing the evidence in this case, it is the Court's opinion that Rubin W.

Mayronne, Jr., d/b/a Mayronne Drilling Company, is alone liable to plaintiff for the damages proximately caused by the death of Butley J. Rodrigue.

## FINDINGS OF FACT

1. On March 7, 1964, the deceased, Butley J. Rodrigue, was employed as a "helper" by Loomis Hydraulic Testing Company.

2. On that day, Humble Oil and Refining Company was the owner of the fixed platform from which its well No. 22–R, located eighteen miles out from Grand Isle, Louisiana in the Gulf of Mexico was being drilled by Mayronne Drilling Company. Whether or not Humble also owned the derrick from which Rodrigue fell is not clear from the record, but such a finding is unnecessary since, as hereinafter pointed out, it was, in any event, under the complete control of Mayronne at all times pertinent hereto.

3. Rubin W. Mayronne, Jr., d/b/a Mayronne Drilling Company, hereinafter called "Mayronne," an independent contractor, was actually drilling this well for Humble by virtue of a drilling contract entered into between it and Humble. Mayronne was at all times in charge of the drilling operation and was at all times in control of the platform, derrick, and rig used in this drilling operation.

4. In addition to contracting with Mayronne for the drilling of the well, Humble also contracted with Loomis, an independent contractor, for its services in connection with the testing of the piping and tubing for leaks or damage. Loomis was to perform its services when required by Mayronne, and the services were to be performed on the platform and/or derrick controlled by Mayronne. Loomis was to be notified by Humble when the drilling being done by Mayronne had progressed to the point where Loomis could perform the services contracted for.

5. On March 6, 1964, Humble called for the services of Loomis and Mr. U. J. Derouen, a Loomis "operator," and Butley J. Rodrigue as his "helper," were assigned by Loomis to the job. They arrived at the well site at about midnight and were met by Mr. Jack Webb, Humble's Production Superintendent, who informed them that Mayronne would not be ready for them for several hours. Derouen and Rodrigue then went to bed on Humble's tender which was tied up to the platform. They were awakened at 4:00 a. m. on March 7, and informed that the well was now ready for testing.

6. In order to do the required testing it was necessary to hoist a heavy sheave to the crown, or top, of the derrick where it was to be fastened. As Derouen's helper, Rodrigue was assigned the job of climbing to the crown of the derrick to fasten the sheave after it had been hoisted aloft by an air hoist operated by Mayronne.

7. The crown of the derrick was between 120 and 125 feet high. At the 85 foot level there was located what is known as a monkey board. This is a platform on which the derrick man works during drilling operations. This monkey board or platform is attached to the side of the derrick and extends inward toward the center of the derrick. From his position on the monkey board the derrick man can rack the pipe coming out of the hole and perform such other duties as are required of him. At this level, where the monkey board is located, there is, extending around the outside of the derrick, what is called a runaround. This is a walkway about three and one-half feet wide with a steel grating floor which runs completely around the outside of the derrick. There is a steel ladder attached to the outside of the derrick which extends all the way from the floor level of the derrick to the crown. This ladder passes the monkey board and at that point is located along the outside of the derrick passing between the outer edge of the monkey board and through a three and one-half foot square hole in the floor of the runaround. It was by way of this ladder that Rodrigue climbed to the crown of the derrick. The runaround is equipped with a guard rail made of one inch angle iron about three or four feet above the floor. At the crown level there

is another runaround similar to the one at the monkey board level.

8. Since the weather was cold, and in order to protect the derrick man from wind while he was working on the monkey board, either Mr. Benjamin F. Parker, Mayronne's derrick man, or some other Mayronne employee, had installed a canvas windbreak around the monkey board. This windbreak was made by wrapping a piece of heavy canvas twelve feet high, around the derrick at the monkey board level, enclosing the monkey board and shielding it from the wind. Instead of passing this canvas between the ladder and the derrick, it was, in this instance, passed on the outside of the ladder, thus covering about twelve feet of the ladder. There was a four foot flap or opening cut in the canvas at the monkey board level to permit a person to pass through it when going from the runaround to the monkey board, or from the monkey board back to the runaround.

9. There was no reason why this canvas windbreak could not have been attached to the derrick so that it would pass between the derrick and the ladder, thus leaving the ladder exposed and unobstructed for use. As it was installed, covering up a twelve foot section of the ladder, it was necessary for one using the ladder to descend from the crown to use the ladder in a normal fashion until he reached the canvas, and then to either try to descend the next twelve feet by attempting to step on the canvas-covered rungs of the ladder, which would be extremely difficult and dangerous, if not impossible, or to swing himself to the inside of the ladder when he reached the canvas so that he could use the unobstructed side of the rungs of the ladder to negotiate that twelve foot section. If he selected the second alternative, after having reached the monkey board level he would have to crawl through the flap opening in the canvas to reach the outside of the ladder and continue his descent. If the latter procedure were used during the negotiation of this twelve foot section of the ladder covered by the canvas, his weight would be pulling him away from the ladder which, because of the shape of the derrick, leans inward from the bottom upward, rather than allowing him to have his weight resting against or falling toward the ladder as would be the case if he were descending in the normal manner on the outside of the ladder. The canvas windbreak had been installed in this manner at least a week prior to the happening of this accident. While Mr. Parker testified that he had seen a windbreak installed in this fashion on other derricks, nevertheless the safer way to have attached it would have been to pass the canvas through between the ladder and the derrick, thus leaving the ladder free and unobstructed for normal use.

10. This derrick was equipped with flood lights located on the inside of the derrick, with one being located about every ten feet from the bottom to the top of the derrick. These lights were staggered in such a manner as to illuminate the entire interior of the derrick when all of the lights were burning. Five of these flood lights were located above the monkey board level, and were intended to illuminate the thirty-five or forty feet of the derrick which extended above the monkey board.

11. On the night of this accident, the five flood lights located above the monkey board were not burning. A wire which supplied current to these lights had been severed, and these lights had been out for two or three days prior to the accident. Mayronne, through its employees, knew that these lights were out and that they had been out for several days. No effort was made to fix them even though they could have been fixed, and after the accident actually were fixed by simply splicing the broken wire. With these lights out, the area above the monkey board was in darkness. It was, in fact, so dark above the monkey board level that visual signals to the deceased, who was working at the crown, could not be seen when given by Parker, who was on the monkey board. Audio signals had to be used.

12. Rodrigue, pursuant to instructions from Derouen, ascended the ladder to the crown of the derrick where he fastened the sheave after it was hoisted up to him. Ordinarily he would, while at the crown, give signals or instructions to someone on the floor of the derrick as to how high to hoist the sheave, etc., but on this occasion, because of the darkness in which he was working, Parker had been requested to station himself on the monkey board so that he could relay Rodrigue's instructions to the derrick floor. Because of the darkness Parker and Rodrigue were unable to use hand signals but instead had to resort to hollering their messages back and forth.

13. When Parker thought that Rodrigue had completed his job at the crown, he, Parker, descended to the derrick floor from the monkey board. But before Rodrigue left the crown Derouen noticed that the Loomis line or hose connected to the sheave had become tangled with the air hoist line. He pulled on the hose to get Rodrigue's attention. Rodrigue apparently understood because Derouen noticed that the cable or hose became untangled.

14. After the lines were untangled, Derouen waited for Rodrigue to come down. After three or four minutes had elapsed, Derouen saw what appeared to him to be a shadow falling downward. When he saw it strike a runaround about ten feet above the derrick floor, and then fall to the floor level, he realized that it was Rodrigue who had fallen to the floor of the derrick. Rodrigue died as a result of this fall.

15. Later that morning Parker was instructed by Mayronne's driller to repair the wire that fed lights above the monkey board, which he did without difficulty and in a very short time. While doing this job he found one of Rodrigue's gloves and his class ring on a rung of the ladder some distance below the monkey board, probably about thirty rungs. He found the other glove on the floor of the runaround at the monkey board level a few inches from the hole through which the ladder passed. He also saw what he believed to be a mark or scratch on the top of the hand rail around the runaround at the monkey board level which he thought had been made by one of Rodrigue's boots.

16. It is common practice for oil rigs to be equipped with climbing belts for use by those who go above the floor level of the derrick. This device consists of a harness worn by the climber which is attached to a cable extending up to the crown of the derrick and through a pulley. A counter-balancing weight is attached to the other end of the line which would decrease the speed of a person's descent should he accidentally fall. Generally the safety regulations of most drilling companies require that safety belts be used by those who climb above the floor level of the derrick.

17. Not only was there no safety line rigged on this structure, but there was none available on the rig for use if someone requested it. The testimony shows that the Loomis men, including Rodrigue, always used climbing belts when they were available, but that oftentimes the companies for whom they did testing, and which they referred to as the "smaller drilling companies," do not make them available. In this instance, Mayronne made none available.

18. The Court finds, as a fact, that Rodrigue slipped and fell from some point above the monkey board, probably while attempting to negotiate the area of the ladder covered by the canvas.

19. The Court further finds as a fact that the accident was caused by three contributing factors, i. e., (1) the negligent manner in which the canvas was wrapped around the ladder, (2) the negligent failure to provide proper lighting of the derrick above the monkey board level, and (3) the negligent failure to provide those who climbed the derrick with a safety line or climbing harness.

20. The Court further finds, as a fact, that these negligent acts of commission and omission were acts of negligence on the part of employees or agents of Mayronne Drilling Company, who

were in charge of the drilling operation and all of the facilities used in connection therewith at the time of this accident, and that these negligent acts of commission and omission combined to constitute the proximate cause of this accident.

21. The Court also finds as a fact that there is no preponderance of evidence whatsoever that could lead to the conclusion that the deceased, Butley J. Rodrigue, was guilty of any negligence whatsoever contributing to the cause of this accident.

## CONCLUSIONS OF LAW

1. Jurisdiction over this matter is found to be present under the provisions of the Death on the High Seas Act, 46 U.S.C.A. § 761. This accident clearly occurred on the high seas in the area known as the Outer Continental Shelf, and it is therefore governed by the Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1331–1343. Since the Outer Continental Shelf Lands Act specifically adopts the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., as the basis of compensation for death or disability of an employee, 43 U.S.C.A. § 1333(c), the survivors of the deceased have the right, under 33 U.S.C.A. § 933 to pursue whatever right to damages that might be open to them, and hence they have the right to bring this third party claim under the Death on the High Seas Act. Pure Oil Co. v. Snipes, 293 F.2d 60 (CA5–1961).

2. The law applicable to a claim under the Death on the High Seas Act is Federal Maritime Law. First National Bank in Greenwich v. National Airlines, Inc., 171 F.Supp. 528 (S.D. N.Y.–1958), affirmed 288 F.2d 621, cert. den. 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d

57 (1961); Petition of Gulf Oil Corp., 172 F.Supp. 911 (S.D.N.Y.–1959).

3. Mayronne Drilling Company, the drilling company who was in charge of operations in this case, and who was in complete control of the drilling rig and equipment which deceased, Butley J. Rodrigue, had to use in the performance of his work, is, in law, held to the standard of care required of a reasonable man under similar circumstances, and the amount of care required increases as does the foreseeable risk to others. Noel, et al. v. United Aircraft Corp., 219 F. Supp. 556 (D.Del.–1963), 342 F.2d 232, 359 F.2d 671.

4. Mayronne, in improperly wrapping the canvas windbreak around the ladder used by deceased, and in failing to furnish a properly lighted area above the monkey board on the derrick where deceased had to work, and in failing to furnish deceased with a safety line and harness when he climbed to the crown of the derrick, was guilty of negligence proximately causing the death of the deceased, Butley J. Rodrigue.

5. Neither Humble Oil and Refining Company nor the deceased, Butley J. Rodrigue, were guilty of any negligence contributing to the cause of this accident.

6. By stipulation between counsel, the pecuniary loss of the plaintiffs, jointly, is the sum of $75,000.

7. Plaintiffs are entitled, as a matter of law, to recover from Mayronne Drilling Company, the sum of $75,000, plus interest at the legal rate thereon from the date of decedent's death until paid. National Airlines, Inc. v. Stiles, 268 F.2d 400 (CA5–1959), cert. den. 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121.

Judgment will be entered accordingly.