**TETTERTON**
v.
**ARCTIC TANKERS, Inc., et al.**
No. 461 of 1950.

United States District Court
E. D. Pennsylvania.
Aug. 24, 1953.

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

Rawle & Henderson, Philadelphia, Pa., for respondents.

KIRKPATRICK, Chief Judge.

This is an action in admiralty brought by the administratrix of the estate of Fenner Tetterton, a seaman, to recover damages for his death. Tetterton, while mentally deranged, committed suicide on board the S. S. New London, owned by Arctic Tankers, Inc., and at the time operated under bareboat charter by United Tankers Corporation, through Mathiasen's Tankers Industries, as operating agent. The tort alleged is failure on the part of the responsible officers of the vessel to use due care to keep Tetterton from killing himself.

Tetterton, an oiler, had sailed with the New London to Europe and then back to Venezuela, to a small native settlement on the San Juan River, named, Caripito, where there is a large oil refinery installation. If, during the voyage, he had shown any signs of insanity or mental disorder, it does not appear from satisfactory evidence that either the master or officers knew about it. While the ship was at Caripito he came to the master's quarters in an agitated state, weeping, and told the master that some person or persons on the ship were trying to hurt, or possibly kill, him. The master tried to quiet his fears and told him that he would give him a cabin to himself, amidships, having in mind a spare room, then occupied by the pilot.

The ship left Caripito on September 2 with a river pilot aboard. About noon she went aground on a bar near the mouth of the river, some six miles from Caripito, and did not free herself until about 3 o'clock on the morning of September 4.

At two o'clock in the morning of September 3, while the ship was still aground, Tetterton was reported missing from his watch. A fire and boat drill was called in the hope that he would show up, but without result. The ship was searched and he was found by the chief officer hiding in a narrow space underneath the blowers in the blower room near the bottom of the vessel. He told the chief officer that he was hiding because somebody on the ship was trying to "get" him. Following this occurrence he was placed in the hospital room.

He wandered away from the hospital room and on the night of September 3 was again reported missing. He was found the following morning hiding in a ventilator cowl. He again said that someone was out to get him. He named his brother-in-law, who was not on the ship, and said that he could not sleep.

By this time the pilot had left the ship and Tetterton readily agreed to go to the now vacant spare room. The mas-

ter made a rather thorough search of the room, primarily to see whether anything had been left by the pilot. He also searched Tetterton's pockets and started to take his belt away but desisted when Tetterton, who was entirely willing to be confined, said he wasn't going to do anything.

After having chains placed across the porthole and locking the door, the master left Tetterton, who seemed only to want to get some sleep, in the room. The radio operator whose office was nearby was instructed to look in the porthole from time to time.

About 12 o'clock the radio operator reported Tetterton lying on the floor and when the master and chief officer, together with two or three seamen, opened the door of the room they found Tetterton with his throat cut and in a dying condition. He had used a razor blade, which was found on the floor the following day when the room was cleaned.

I have no doubt that from the time that the ship was at Caripito the master believed that Tetterton was insane, as that term is understood by laymen, and I so find. Although Tetterton's delusion had to do with his own safety and there is no evidence that the master knew of any threats of suicide, the master did know what laymen generally know, namely, that there is always danger that an insane person will harm himself. He plainly recognized this fact when he searched the room and Tetterton's pockets and when he proposed to take away the man's belt.

Where did the weapon come from? I think the evidence warrants a finding that when Tetterton entered the pilot's room he brought his personal belongings, including a shaving kit, with him in his duffel bag. It would be a natural thing for him to do, inasmuch as he was being transferred to new living quarters for an indefinite time. One of the seamen testified that when the room was entered the bag was there and that it had blood on it, indicating that it had been there when Tetterton cut his throat. I cannot find that either the master or

the chief officer stated categorically that Tetterton brought nothing with him. In fact, the chief officer testified, when asked where the razor blade had come from, "No, I have no idea where it came from, whether it came from his belongings or whether he found it in the room." Both of the seamen who went into the room testified that Tetterton's razor kit and razor were on the washstand in the bathroom covered with blood. I find that when Tetterton entered the room he brought with him his shaving kit in his duffel bag, which was not searched.

■ I cannot find that the master was grossly negligent, but I think that what he did fell just short of the standard of care required under all the circumstances. The procedure he adopted in confining Tetterton in a room by himself was entirely proper. His treatment of the man seems to have been kindly and understanding. About the only thing which he omitted to do was something which, if it had been done, would have prevented the suicide, namely, making a search of the personal belongings which Tetterton brought with him.

■ There was a hospital at Caripito, staffed by American doctors and nurses, and the libellant contends that the master should have sent Tetterton there for care and treatment. I agree that the master was aware of Tetterton's mental condition before they left Caripito. It would be hard to explain his decision to give him a room by himself, unless he had heard the talk which had been going around the ship or unless, at the interview, Tetterton had unmistakably manifested signs of serious mental disorder. However, I am not disposed to charge him with negligence on this ground. Mental illnesses are not cured by a visit to the doctor and a dose of medicine. The choice was between leaving the demented man at Caripito and trying to get him safely home. One would think that the latter course would be the better and, as a matter of fact, from the testimony of Dr. Ornsteen, it is not at all unlikely that if there had been a psychiatrist at the hospital he would

have told the master to do just what he did.

The administratrix is entitled to maintain this action, but the question remains: Upon whose behalf?

She claims in her own right, as widow, but I think that it is clear that she never was legally married to the deceased seaman. She first met him in the early part of 1943. At that time she had a husband, a man named Bochiccio, whom she had married a few months before she met Tetterton, who had been sent to jail for some offense, shortly after her marriage to him. In spite of her testimony that she relied upon advice given her by a patrolman on the beat to the effect that Bochiccio's jail sentence dissolved their marriage, I think she was fully aware that she could not legally marry another.

In June of 1943 Tetterton telephoned her from Florida and told her "you don't really have to be married down here to live as husband and wife." As a result she went to Florida and entered into a compact of some kind with him. Whether the parties really believed that they were making a valid marriage or intended to do so is doubtful. I think it is more likely that Maria understood no more than that she and Tetterton could live together in Florida without violating any law.

■■ However, assuming that what they accomplished would have been a valid common-law marriage under the law of Florida if there had been no disability by way of Maria's existing marriage, she still did not become at any time a legal wife. She obtained an annulment of her marriage to Bochiccio in 1948. Such a decree did not relate back so as to validate an attempted subsequent marriage entered into by one of the parties prior to the rendition of the decree, 55 C.J.S., "Marriage", § 68. There are decisions which hold that where parties to an agreement, which but for the existence of an impediment would have constituted a valid marriage, continue in the relationship in good faith, on the removal of the impediment, the law will establish a valid common-law marriage. The decisions cited by the libellant however agree that the common-law marriage so established dates from the removal of the impediment. The difficulty with the libellant's position in this respect is that when the impediment was removed she was, and has been ever since, domiciled in New York and New York does not recognize the validity of a common-law marriage entered into in that State since 1933. There is no proof that Maria and Tetterton were domiciled at any time in any state which permits common-law marriages. Virginia, where she and Tetterton visited his relatives, does not.

■■ The father is clearly a party entitled to damages under the statute and I am of the opinion that the child, Diana, is also entitled. Middleton v. Luckenbach S. S. Co., Inc., D.C., 70 F. 2d 326. The Death on the High Seas Act, 46 U.S.C.A. § 761 et seq., being applicable to this action, recovery for pecuniary loss by the daughter does not exclude recovery of his loss by the father.

■■ In allowing damages, one very important factor is that this is the case, not of a normal person but, of one suffering from a mental illness, the extent and probable duration of which is impossible to determine, one phase of which was suicidal. It is obvious that the probable earning capacity of such a man will be far below that of a normal individual.

I find that the daughter, Diana, has suffered pecuniary loss by reason of Tetterton's death in the amount of $4,000.

I find that the father, Claude Tetterton, has suffered pecuniary loss in the amount of $2,000.

I allow the sum of $2,000 for pain and suffering.

A decree may be entered in accordance with the foregoing against Arctic Tankers, Inc., and United Tankers Corporation and dismissing the libel against Sieling & Jarvis Corporation and Mathiasen's Tankers Industries.