Myrtle **TWEEDY**, as **Administratrix of the Goods, Chattels and Credits which were of Harold F. Tweedy, Deceased, Plaintiff,**

v.

**ESSO STANDARD OIL COMPANY, Defendant.**

United States District Court
S. D. New York.

Dec. 6, 1960.

Krisel, Beck & Taylor, New York City, for plaintiff, by Goldstein & Sterenfeld Jacob Rassner, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant; Walter X. Connor, George T. Delaney, James P. O'Neil, New York City, of counsel.

McGOHEY, District Judge.

The plaintiff sues under the Jones Act, 46 U.S.C.A. § 688, to recover damages for the alleged wrongful death and conscious pain and suffering of her husband, Harold F. Tweedy.

The suit was tried to the court without a jury. The findings and conclusions appear in the opinion.

The deceased was 58 years old at his death. He was then employed as cook on the defendant's twin screw diesel tanker Esso Potomac. He had been a cook on similar vessels for several years. He was last seen alive just after supper, at 6:30, on the evening of April 16, 1957, while the vessel, fully loaded, was proceeding south in Chesapeake Bay from Baltimore, Maryland to Alexandria, Virginia. His body was recovered five days later. The Medical Examiner reported the immediate cause of death as "Drowned, found drowned." As far as appears, the body showed no evidence of other injury, and indeed no such claim was made.

After the crew finished their meal, Dopkowski, a pumpman, volunteered to help Tweedy by washing the dishes. Other members of the crew sat about the galley talking. Tweedy carried the garbage bucket out the door on the port side of the galley opening onto the after deck, to dump the garbage into the water. The vessel was heading into a 15 mile wind. The waves were about 2 ft. high. The vessel was making about eight knots and riding smoothly. She was not taking water over her decks. The after deck was free of oil and grease. The bucket's capacity was about 12 gallons, and it had a removable cover. It was half full and the cover was on. Tweedy proceeded to the rail on the port side near the stern where, after removing the cover, he emptied the bucket over the side. He then left the rail, carrying the empty uncovered bucket, and walked forward near the port rail. The rail was about 2 ft. 6 in. high and the top was 5 in. wide. The vessel's freeboard while running was

from 13 to 16 inches. Tweedy was about 5 ft. 2 in. tall and quite stout. He weighed between 200 and 225 pounds. The top of the rail came to about his waistline which, by all accounts, was quite ample.

Tweedy did not reenter the galley. He was in Dopkowski's view from the time he left the galley until he passed the doorway going forward along the port rail. The deck on the port side was dry and free of oil and grease. No call from Tweedy was heard, but when, after a few minutes, he failed to return, Dopkowski commented on this to the others in the galley and they immediately instituted a search. This included the water, the port side deck outside of the house, the washroom which is close by and forward of the galley, and the crew's quarters. The search failed to discover Tweedy on the vessel or in the vessel's wake or elsewhere in the water. Dopkowski thereupon notified the master. It was then 6:42. This was twelve minutes after Tweedy had left the galley to empty the bucket, and about ten minutes after Dopkowski had last seen him. The vessel, proceeding at eight knots, was then at least a mile and a half south of her position at the time Tweedy was last seen alive.

The master was then on duty on the bridge. As Tweedy was last seen on the port side, the master ordered a hard left turn in order to swing the propeller away from that side. He also ordered a thorough search of the entire vessel, and stationed lookouts on top of the forward and after houses to search the water. He turned on the vessel's searchlight and floodlights. He put her about and set a course to backtrack over the area the vessel had traveled since 6:30. He put through a radiophone call to the Coast Guard and alerted all vessels in the area. These and a Coast Guard vessel joined in the search. The vessel made a series of "sweeps" up and down the bay, traversing the area traveled since 6:30. Some time between 7:15 and 7:30, Dopkowski and another crewman, Krause,

told the master they saw what they believed to be Tweedy's body floating face down with arms outstretched. Dopkowski and Krause differed as to the distance this object was from the vessel. The former said "more than fifty feet." Krause first said "one hundred feet," but later that it "might have been three hundred feet." Neither the master nor the other men were able to see what Dopkowski and Krause said they saw. Nevertheless the master accepted their word and promptly put one engine into reverse, thus turning the vessel sharply, and proceeded with speed to the indicated area. Tweedy's body was not located during a careful search of that area. I find Dopkowski and Krause were mistaken in their belief. The vessel continued to sweep that and the rest of the whole area until 11:30 p. m., when the Coast Guard authorized discontinuance of the search.

The vessel was equipped with two lifeboats. Neither was lowered during the search. Throughout the search, however, the master and all but one man who was on duty in the engine room maintained a constant lookout from the roofs of the fore and aft houses which are the highest parts of the vessel. All were wearing life jackets. The master had life rings with lines attached ready to be thrown over at once if Tweedy was sighted. And men were detailed, if that occurred, to go with the master into the water with additional appropriate equipment which was ready, to rescue Tweedy. The searchlight and the floodlights were on throughout the five hours of searching.

It is contended that the conceded absence of an automatic garbage disposal unit on the vessel made her unseaworthy and constituted negligent failure to provide a reasonably safe place for Tweedy to work. While it is possible, though only with some difficulty and substantial expense, to install such a unit on the Esso Potomac, the uncontradicted evidence is that no tankers of her size are, or ever have been, so equipped. The latter fact, though relevant, is, of course, not neces-

sarily conclusive.[1] In any event, I find that the absence of such a unit here had no causal relation to Tweedy's death. He disposed of the garbage over the side without injury of any kind. If, as was suggested in argument although there was no such testimony, he fell or was pulled into the water while attempting to wash the bucket by dipping it into the bay, it was solely his own gross negligence which produced that result. The inherent danger of such conduct was obvious to any man; and surely to one of his age and experience. He had served as cook on similar vessels for many years prior to his death. He certainly was not required to expose himself to such danger by any rule or order, and it certainly was unnecessary for him to do so in order to wash the bucket. The washroom was close by and available for washing out the bucket. Indeed this was frequently done there.

█ A further contention, and the one most urgently pressed, is that the rescue attempt was negligently conducted in that neither of the vessel's two lifeboats was manned and lowered at 6:42 when Tweedy was reported missing, or later when Dopkowski and Krause reported seeing his body face down in the water. This contention is rejected.

The vessel, a small tanker of the type commonly used on inland waters, has the following dimensions: length 246 ft., beams 40 ft., depth 14.6 ft., motor horsepower 1240, gross tonnage 1228. She carried two lifeboats propelled by oars. She was rated A–1 by the American Bureau of Shipping.

The plaintiff offered no testimony as to what good practice required under the existing conditions. The master is a man of long experience. He has been master of the Esso Potomac for 15 years. He testified that the procedures he adopted here were, in his opinion, the best

under the existing conditions for the following reasons. The vessel had traveled at least a mile and a half before Tweedy's absence was discovered. The vessel could be maneuvered easily. She could, as indeed she did, backtrack over that distance faster than men could row a lifeboat. The area of water visible to lookouts on the house tops was far greater than would be visible to men in a lifeboat. If Tweedy were sighted the master could get the vessel to him much more quickly than a lifeboat and with more equipment and men to get him out of the water. The master testified in person, and cross-examination did not shake his testimony. He impressed me favorably as to both professional competence and truthfulness. While he undoubtedly had an understandable interest in defending his own professional conduct and reputation, this was not manifest in his demeanor and did not, I find, cause him to color his testimony. I accept this and find the procedures he adopted were proper under the circumstances. He was neither negligent nor inefficient in his rescue efforts.[2]

Tweedy's death did not result from any negligence of, or breach of duty owed him by, the defendant.

█ The following findings are made so that if, on appeal, this court's decision on liability is reversed, remand for findings on damages will not be required.

There is no evidence whatever that Tweedy endured any conscious pain and suffering. For all that appears, death may have occurred either at once or so soon after he entered the water as to be deemed simultaneous with the accident.

Tweedy was survived by his widow and two sons, Harold and Robert. At the time of their father's death Harold was 25 years old, married and self-supporting. Robert was then 19 years, 10 months old. He is afflicted with cerebral

---

1. Texas & P. R. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905; The T. J. Hooper, 2 Cir., 60 F.2d 737; Poignant v. United States, 2 Cir., 225 F.2d 595.

2. See Miller v. Farrell Lines, 2 Cir., 247 F.2d 503, certiorari denied 355 U.S. 912, 78 S.Ct. 342, 2 L.Ed.2d 273.

palsy and deaf. Apart from this his general health is good. He is incurable and unemployable. He has not responded to occupational therapy, and with strangers is unruly. Only his mother can manage him. She is with him constantly.

Mrs. Tweedy owns the house in Flushing, New York, where she lives with Robert. A separate apartment in the house is rented.

The Tweedys were never divorced or legally separated but they lived completely apart for eight years prior to his death. They did not meet, speak or correspond with each other during that period although he knew where she lived and she knew he lived with a nephew in Norfolk, Virginia and worked as a seaman for the defendant. During that period she never received any support from him for herself.

For several years before they separated in 1949, Tweedy was a heavy drinker and had a poor work record. Mrs. Tweedy testified that while they lived together he gave her all but $10 a week of his earnings. This is rejected. It is inconsistent with her testimony as a whole and with the uncontradicted documentary evidence. She testified that in 1947 when he was working on a construction project on the Island of Okinawa, he sent her only $400. There is no evidence he sent any additional sums to his children. Whether or not the $400 was sent pursuant to court order and whether it was for support of the children only does not appear.

Mrs. Tweedy brought proceedings in the Domestic Relations Court in Queens County, New York in 1947 and again in 1948, 1949 and 1950. The first two of these appear to have been disposed of without court order. However, on November 9, 1949, Tweedy was ordered to pay $25 per week for the support of his two sons.[3] There was no provision for payment to Mrs. Tweedy for her support. In August, 1950, after Tweedy defaulted for several months in these $25 payments, Mrs. Tweedy brought another proceeding in Queens County Domestic Relations Court. The records in this proceeding were received in evidence; part as Plaintiff's Ex. 24, and the remainder as Defendant's Ex. A–1. The latter includes the petition signed by the plaintiff, the court's "Chronological Record" and other papers including official correspondence between the court and the City Department of Health. The petition, a printed form, on its face states that both Mrs. Tweedy and Robert are "in need and entitled to support" and prays for "such an Order for Support as shall be deemed fair and reasonable." The court's "Chronological Record" states, in a section entitled "Intake Interview," that Mrs. Tweedy was "referred by D. A. *She is concerned with support for son Robert, 13 years old.*" [emphasis added.] The court made a certificate pursuant to the Uniform Support of Dependents Law [4] and forwarded this with a certified copy of the petition to the Juvenile and Domestic Relations Court at Norfolk, Virginia. The certificate states "The needs of the dependents are the sum of $25 per week." This, however, is the same amount ordered in November, 1949 to be paid for the support of Robert and Harold only. As far as appears, Mrs. Tweedy brought no further proceedings. Payments for the sons' support were forwarded by Tweedy's nephew or his sister who received the money from him.

On a few occasions Tweedy sent small gifts of money to his sons at birthdays or holidays. The amount or the frequency of such gifts was not shown. The testimony as to gifts came in through the depositions of Tweedy's sister and his nephew who reside in Norfolk. Tweedy's older son, Harold, was not called as a witness.

There is not the slightest likelihood that if Tweedy had lived he would have

---

3. This amount was reduced to $15 when the older son, Harold, became 21 in August, 1953.

4. McK.Unconsol.Laws, §§ 2110–2120.

attempted reconciliation with the widow or that, if he had, she would have agreed. And it is clear that Tweedy never would have increased his contributions to his invalid son voluntarily. Mrs. Tweedy never sought to have them increased. Tweedy was a completely self-centered man. According to his sister and his nephew, both of whom were friendly to him and whose testimony on this I accept, he used all his available funds to satisfy his every desire regardless of cost. He left no estate.

I find Mrs. Tweedy had no reasonable expectation of ever receiving contributions from the deceased if he had lived. It is significant that in the several proceedings she did bring between 1947 and 1950 no award was made for her support. Whether this was because the court found her disentitled to support, does not appear.

In Civil v. Waterman Steamship Corporation [5] and in Diaz v. Lykes Bros. Steamship Co.,[6] the Court of Appeals for this circuit sustained awards to widows long separated non-legally from their deceased husbands who had not contributed to their support. In neither does it appear how the award was computed. In Civil, it was made by the trial judge in Admiralty.[7] In Diaz, it was made by a jury. In each case, however, there was present more than the mere existence of a legal right to compel support of the widow. In Civil, the widow had made one attempt, later abandoned, to get support 19 years before her husband's death. Thereafter she did not know his whereabouts. In Diaz,

some three years before his death the deceased returned to his wife for two or three weeks and promised to support her and to establish a home for her and their children.

The fair inference here is that Mrs. Tweedy did not seek support for herself in any of the proceedings she brought. It is inconceivable that the Domestic Relations Court would have refused her support if she had asked for it. I find she did not. I think the rule in Civil and Diaz not applicable to the facts here.

It was stipulated that Tweedy's average annual gross wage for the five years prior to his death was $4,000. There is no evidence as to what, if any, tax exemptions he claimed for dependents but it may safely be assumed he claimed at least two. Accordingly, his annual withheld tax was about $360. His only contribution to any of his family after 1953 was $780 annually to his invalid son. Tweedy's work expectancy at his death was at most eight years. He would then be eligible to receive Social Security benefits, and there is no reason whatever to suppose he would work when he could secure funds without working.

The annual contributions for the 3½ years since Tweedy's death would amount to $2,730. This would not be subject to discount.

The present value of annual contributions of $780 for the next 4½ years, commuted at 4%, is approximately $3,152.

The defendant is entitled to judgment in its favor.

5. 2 Cir., 217 F.2d 94.

6. 2 Cir., 229 F.2d 269.

7. This case was decided prior to Conte v. Flota Mercante Del Estado, 2 Cir., 277 F.2d 664, which held applicable to personal injury claims in Admiralty, the rule announced in Alexander v. Nash-Kelvinator Corporation, 2 Cir., 261 F. 2d 187–191, that the trial judge in a non-jury personal injury case must make sufficiently explicit findings to show the basis of his award.