Mrs. Lucy Turner **WHITAKER**, as Administratrix of the Estate of Willie Turner, deceased, Libellant,

v.

**BLIDBERG–ROTHCHILD COMPANY,** Inc., in personam, and **THE SS SOUTHPORT,** in rem, Respondents.

### No. 8025.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 5, 1961.

⚷82

Sidney H. Kelsey, Norfolk, Va., for libellant.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

■ This libel seeks a recovery for the death of a seaman, Willie Turner, while a member of the crew of the SS Southport, owned by Blidberg-Rothchild Company, Inc. The claim is filed under the Death on the High Seas Act, 46 U.S.C.A. §§ 761–767, and the Jones Act, 46 U.S.C.A. § 688. Because the decedent was survived by a non-dependent daughter (born December 20, 1943), the mother, who is the libellant here, is not entitled to recover under the Jones Act. Poff v. Pennsylvania R. R., 2 Cir., 150 F.2d 902, reversed on other grounds 327 U.S. 399, 66 S.Ct. 603, 90 L.Ed. 749. Nevertheless, libellant, as the dependent mother, may recover under the Death on the High Seas Act and the measure of damages is the same as under the Jones Act for the purposes of this case.

Willie Turner was lost at sea on February 15, 1959, while the Southport was approximately ten hours off the coast of the United States inbound to Norfolk. At 11:40 P.M., Turner was reported missing. An immediate search of the vessel was ordered and, at 12:10 A.M., the third officer reported that Turner's cap and shoes had been discovered on the aft end of the ship. With a Williamson turn the course of the vessel was reversed and an effort was made to locate the seaman in the water, but without success. While libellant contends that the absence of searchlights and the failure to use blinker lights impose liability upon the vessel under the "failure to search" doctrine, it is unnecessary to enter into any extended discussion of this phase of the case, except to note that, if libellant's right of recovery was predicated solely upon the "failure to search", the opinion of this Court would be adverse to libellant's contention.

■ The events leading up to Turner's suicide are pertinent and, upon consideration of all of the evidence, lead to the inevitable conclusion that any reasonable person would have appreciated the absolute necessity of restraining and guarding a man in his condition. The Court is not unmindful of the fact that the master and officers were not medical experts chargeable with the duty of making a medical diagnosis, but when the actions of the seaman are so obviously strange as to lead to but one conclusion, the negligent breach of duty to protect the mentally incompetent seaman imposes liability upon the vessel and her owner. Reck v. Pacific-Atlantic S. S. Co., 2 Cir., 180 F.2d 866; Russell v. Merchants & Miner's Transportation Co., D.C.E.D.Va., 19 F.Supp. 349; Batkiewicz v. Seas Shipping Co., D.C.S.D.N.Y., 66 F.Supp. 205; The Carson, 9 Cir., 104 F.2d 762; McDonough v. Buckeye S. S. Co., D.C.E.D.Ohio, 103 F.Supp. 473, affirmed 6 Cir., 200 F.2d 558, certiorari denied 345 U.S. 926, 73 S.Ct. 785, 97 L. Ed. 1357.

On February 7, 1959, Turner complained of extreme nervousness and contended that "people are talking about me". He had requested the radio operator to send a message to his grandmother to the effect that "he had enemies and he was afraid that they might do him some damage or physical injury". The master, upon being notified of Turner's request by the radio operator, interviewed Turner and the crew. His investigation revealed that there was no foundation for such thoughts on Turner's part and, upon being so advised by the master, Turner suggested that he may have been mistaken and directed that the message not be sent.

One week later, on the night of February 14, Turner did not sleep in his bunk. The following morning he was located in the ship's laundry wrapped in a blanket. He was again interrogated by the master and Turner advised that he was sleepy and thought that he would be less disturbed in the laundry room away from noise. The master took Turner to the ship's hospital and put him in a bunk. As the master was about to leave the room, Turner said, "Maybe you had better handcuff me to the bunk because I might do something desperate." At that time the master indicated that Turner appeared to be rational and quiet. The request to handcuff Turner to the bunk was fulfilled and the master assigned a man to stay with him.

At 4 P.M., according to the log, Turner was released from his handcuffs. He had previously requested an advance of $45, and, as other crew members were getting advances, Turner was brought to the master's quarters. In response to an inquiry Turner stated, "I'm feeling fine. Going to use this money when I get to Norfolk. You don't have to handcuff me any more, because I'm feeling normal and good again." The master then assigned men to stay with Turner and, after supper, Turner indicated that he would like to stand his midnight watch. The master replied that they would check with him at that time and perhaps permit him to act as a lookout with the second mate. As the master expressed it, "I knew to keep his mind occupied was much better than having him around sitting." Turner delivered his $45 to the master to put in the safe with $80 previously deposited.

The medical log reflects that on the voyage from Bilbao, Spain, to Hampton Roads, Turner's first complaint was on January 31, 1959, the day of departure, when he stated that he had an upset stomach and was given Pepto-Bismol. The entry at 4 P.M. on February 7 is as follows:

"Extremely nervous. Believes that people are talking about him. Claims his stomach is upset. Given *pepto bismall* & vitamin tablets."

Again on February 13 at 6 P.M., we find:

"*Head Ache* & Upset Stomach. Given *pepto bismal* & aspirin & *pentobarbital*. Complained that he may not be able to stand his wheel watches, due to severe pain in head. Was told he could stay in bed if he desired."

Apparently Turner stood his 12 to 4 watch that night and the following entry appears at 8:10 A.M. on February 15:

"At 0800 it was found that he did not sleep in his bunk after coming off watch at 0400. He was sleeping in the ship laundry room with the door locked. He was told to sleep in the ship hospital & given *pepto bismal* to settle his stomach. At 0830 he requested the master to put handcuffs on him, that he feared he might do something desperate.

"He appeared to be in a very depressed state of mind.

"Handcuffed to bunk in ship hospital and man assigned to watch him."

Turner's condition on the morning of February 15 was known to the entire crew and officers. Prior to the events leading up to his mental breakdown, he was described as a good worker, quiet, reserved, and one who generally remained

away from the other crew members. On February 15 he looked wild-eyed and seemed very depressed. That night, at approximately 9:40 P.M., Turner went to his bunk. He was reported "asleep" at 10 P.M., but the standby watch apparently did not worry about Turner thereafter until he went to call him for his watch at 11:40 P.M., at which time he was missing from his bunk.

While there are variances between the official log and deck log, principally in that the former reflects that crew members were "assigned to watch him continually", whereas the latter does not disclose the word "continually", the decision in this case does not depend upon this variance. Obviously the master merely instructed the standby man to check on Turner from time to time, but failed to give directions not to leave Turner alone.

Perhaps no single incident was, standing alone, sufficient to put a reasonable and prudent man on notice of the magnitude of the risk of harm. However, when all of the surrounding circumstances are weighed, manifestly any reasonable and prudent person would have realized that Turner was mentally deranged and that the condition was serious. Respondents suggest that the danger was to Turner's fellow crew members and that the record is devoid of suicidal tendencies. The fact remains that Turner was mentally ill, the master undoubtedly knew that there is always danger of an insane person harming himself, and the failure to properly guard him under such circumstances was the sole proximate cause of his drowning. Tetterton v. Artic Tankers, D.C., 116 F. Supp. 429.

■ The testimony as to dependency is hopelessly in conflict. In October, 1950, Turner's wife obtained an absolute divorce in the State of North Carolina. No reference is made in the divorce decree to the daughter, Joyce Anne Turner, born December 20, 1943. Turner, his wife, and daughter lived with libellant for eight years until just prior to the divorce. The wife has remarried and the whereabouts of both the wife and child are unknown. In any event it is clear that Turner has not supported his wife and child since 1950.

Libellant has testified that the decedent contributed $300 per month for her support. She attempts to substantiate this figure by listing her monthly expenses aggregating $382.55. She lists her own income as a domestic servant at $80 per month. Thus, she claims, the balance, of necessity, must have come from the decedent. While these monthly expenses have some evidentiary value, they will not stand close scrutiny, particularly in light of libellant's own testimony. The list was prepared by libellant's employer who stated that she obtained the figures from libellant. When considered along with the evidence of decedent's annual earnings, including earnings at sea and on land, it is highly unlikely that Turner grossed as much as $3,600 in any one year, with the possible exception of 1957.

In answer to an interrogatory, libellant stated under oath that she received $300 per month from Turner. Of this amount she stated that $150 per month was paid by allotment, and the balance in cash. The record reveals that from 1953 until his death, Turner registered only three allotments during the entire period, the largest of which was for $100 for one month in 1958. At the time of his death there was an allotment outstanding in favor of libellant in the sum of $75 per month. These facts, when viewed in the light of the sworn answers to interrogatories, cast suspicion upon the accuracy of libellant's statement referring to $300 per month being furnished by decedent.

It should be noted, however, that Turner's sea voyages were of relatively short duration which would tend to avoid the necessity of an allotment. Moreover, for some years decedent was employed locally by the Baltimore Steam Packet Company sailing between Norfolk and either Baltimore or Washington. For such service an allotment would be useless. We have no doubt but that Turner supported his mother in an amount in excess of that shown by the three al-

lotments. Considering his income, the income of his mother, the standard of living and monthly expenses, the Court finds that libellant was dependent upon decedent to the extent of $140 per month.

■ Libellant was 50 years of age at the time of her son's death. She is now 52. Turner was 34 at the time of his death. His life expectancy was 32.02 years. Libellant's expectancy is 22.67 years. His reasonable expectancy of life would, under normal circumstances, exceed that of his mother. Accepting the 3½% interest table for 22 years, the mother's loss, subject to comments hereinafter made, will aggregate approximately $25,500. However, in allowing damages in this case, we are considering the future earning capacity of one suffering from a mental illness, the extent and probable duration of which is impossible to determine, one phase of which was suicidal. It is apparent that the probable earning capacity of such a man would be less than that of a normal individual. Tetterton v. Artic Tankers, supra. On the other hand, medical science has made it possible for mental incompetents to recover, sometimes without further difficulty in life, but occasionally with recurring troubles. Under all the facts and circumstances, the Court fixes the sum of $17,500 as a fair and just award to the dependent mother.

■ There is no merit to libellant's contention that an award should be made for the decedent's conscious pain and suffering prior to death. Under the Death on the High Seas Act, the right to such a recovery reverts to applicable state law. Petition of Gulf Oil Corporation, D.C., 172 F.Supp. 911, 914–920; United States v. The S.S. Washington, D.C., 172 F.Supp. 905, affirmed upon opinion of District Court, United States v. Texas Co., 4 Cir., 272 F.2d 711. The latter case was decided by Judge Bryan in the Eastern District of Virginia applying Delaware law as The Texas Company was a Delaware Corporation. The former case was decided by the Southern District of New York applying the law of Pennsylvania, the place of incorporation of Gulf Oil Corporation. By statute in Virginia a claim for pain and suffering does not survive. Code of Virginia, 1950, § 8–628.1. Moreover, this is not a case in which the seaman languished before death. He may have been immediately killed by having been drawn into the ship's rudder. It would be rank speculation to base an award for conscious pain and suffering. While the record and pleadings do not disclose the respondent's place of incorporation, although it maintains an office in New York, case history reflects that respondent is a Delaware Corporation. McLaughlin v. Blidberg Rothchild Company, D.C., 167 F.Supp. 714.

Assuming, without deciding, that Delaware law is applicable, and further assuming, without deciding, that Delaware law permits a recovery for conscious pain and suffering, we have no facts to justify an award on such element of claimed damages.

Present decree on notice.