Angela ORONA, as Administratrix de bonis non of the Estate of Santiago Orona, Deceased, Plaintiff,

v.

ISBRANDTSEN COMPANY, Inc., and United Mail Steamship Company, Defendants.

United States District Court
S. D. New York.
May 3, 1962.

14. Schuttinger v. Woodruff, 259 N.Y. 212, 181 N.E. 361 (1932).

Sidney Schmukler, Brooklyn, N. Y., for plaintiff; Jacob Rassner, New York City, of counsel.

Stapleton, Flynn & Lilly, New York City, for defendants; Daniel Flynn, Robert G. Farrell, New York City, of counsel.

Kenneth Heller, New York City, amicus curiae on behalf of the infant.

WEINFELD, District Judge.

Santiago Orona committed suicide aboard the s/s Cape Cod, on which he was employed as a bedroom steward, by drinking creosote, a disinfectant, while confined to the ship's hospital. This action is brought against the operator of the vessel under the Jones Act[1] to recover damages for the benefit of his widow and a natural son; damages are also sought for conscious pain and suffering of the decedent.

Orona first showed signs of irrational conduct on May 9, 1959, when the vessel was proceeding coastwise toward Boca Grande, Florida. His irrational behavior became more pronounced the next day, May 10th. He said crew members were trying to kill him; that they wanted to throw him overboard. Some of the crew were afraid of him. In the afternoon of May 10th he talked about jumping overboard. Whatever the precise nature of his conduct, it was such that the captain decided to confine him to the ship's hospital. Upon his confinement, under the captain's orders his belt was taken from him, certain items were removed from the hospital room and, according to the captain, all the drawers of a dresser-like medicine chest were locked. Thereafter two-hour periodic checks were made and at one time it was found that Orona had locked himself in the hospital bathroom; other untoward incidents occurred.

On the following morning, May 11th, at about 8:30 A.M., as the vessel was at anchor outside Port of Boca Grande awaiting a mooring berth, Orona was taken by the captain and the chief steward for a walk around the deck for some fresh air; he broke loose, ran for the rail as if to jump overboard, but was restrained by the chief steward and then returned to the hospital room. About 3:30 P.M. a strong odor was detected from the hospital room and soon Orona was found unconscious; an empty bottle of creosote compound, a poison used for disinfectant purposes which had been in

1. 46 U.S.C.A. § 688.

the medicine chest, was on the floor, drained of its contents. One of the drawers appeared to have been forced. Attempts to administer antidotes failed to arrest the poison and within half an hour after Orona's removal from ship to shore he was pronounced dead; indeed it appears that he was dead when discovered.

The question presented is whether, under all the circumstances, the master exercised reasonable care for the safety of Orona.[2] There can be no doubt that the master knew that Orona was mentally ill. The evidence also supports a finding that he was aware that decedent, on the morning of his death, had attempted to go over the side of the ship. In any event, that the master did recognize there was danger that this mentally ill seaman might harm himself is buttressed by the fact that when Orona was locked in the hospital room he directed that his belt be taken from him and ordered the removal of such items as a stretcher and a pair of crutches.[3] The seaman who removed the various articles under the direction of the captain or the chief mate was not instructed to remove any drugs, medicines or other items from the medicine chest. The defendant's position is that locking the drawers of the chest was the exercise of reasonable care and that it was not reasonably foreseeable that Orona would force any of them open. While it is true the captain appeared concerned about his charge, his failure to remove or cause the removal of a deadly poison under the circumstances fell short of the duty of reasonable care. If, in fact, the drawer was locked, then it is apparent that it was not securely locked, since it was readily opened or broken into; an inference is also reasonable that although Orona's belt was taken from him he was permitted to retain other personal belongings which could have been used to pry open the drawer.[4] The dresser, according to the seaman who removed various loose items from the room, was flimsily constructed and the locks were flat and flush with the cabinet. It is well known that mentally ill people with suicidal tendencies, under stress, are capable of exerting unusual force. Merely locking the dresser when it was known to contain a quick-acting poison was not sufficient protection against the prospect of self-injury by the seaman, who was unguarded and left alone over extended periods. In the circumstances here presented, leaving the poison where it was accessible to one bent on self-destruction constituted lack of reasonable care. This disposition makes it unnecessary to consider the plaintiff's further contention that the defendant was negligent in failing properly to guard Orona[5] and in other respects.

We next consider the question of damages. The decedent was survived by his widow and a son, not born of their union. While the statute[6] in the instance of a surviving widow or child makes no reference to dependency, the measure of damage is the pecuniary loss sustained by each.[7]

2. Reck v. Pacific-Atlantic S.S. Co., 180 F. 2d 866 (2d Cir. 1950); The Carson, 104 F.2d 762 (9th Cir.), cert. denied, 308 U. S. 591, 60 S.Ct. 120, 84 L.Ed. 494 (1939); Whitaker v. Blidberg-Rothchild Co., 195 F.Supp. 420 (E.D.Va.), aff'd, 296 F.2d 554 (4th Cir. 1961) (Per Curiam). See McDonough v. Buckeye S.S. Co., 103 F. Supp. 473 (N.D.Ohio, 1951), aff'd, 200 F. 2d 558 (6th Cir. 1952) (Per Curiam), cert. denied, 345 U.S. 926, 73 S.Ct. 785, 97 L.Ed. 1357 (1953); Batkiewicz v. Seas Shipping Co., 66 F.Supp. 205 (S.D.N.Y. 1945).

3. Compare Tetterton v. Arctic Tankers, Inc., 116 F.Supp. 429, 431 (E.D.Pa.1953).

4. Cf. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916 (1946).

5. Reck v. Pacific-Atlantic S.S. Co., 180 F. 2d 866 (2d Cir. 1950); Tetterton v. Arctic Tankers, Inc., 116 F.Supp. 429 (E.D. Pa.1953). See Lange v. United States, 179 F.Supp. 777 (N.D.N.Y.1960).

6. 45 U.S.C.A. § 51, incorporated by reference in 46 U.S.C.A. § 688.

7. Michigan Cent. R. R. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913). See also, New Orleans & N. E. R. R. Co. v. Harris, 247 U.S. 367, 372, 38 S.Ct. 535, 62 L.Ed. 1167 (1918); Chesa-

The decedent was fifty-four years of age at the time of his death and had a life expectancy of twenty-two years. His annual average earnings as a seaman in the five-year period prior to his death (1954–1958) were approximately $3,500. The widow and decedent were married in December 1952. She testified that for a period of three years thereafter she usually saw him every two or three weeks when he returned from sea; that he gave her $15 per week toward the rent of an apartment where she lived and in addition $125 per month, a total of over $2,200 per year. This testimony was at once negatived by an affidavit signed by her in March 1960 wherein she swore that for two years after the marriage she and the decedent lived in the Bronx, New York City, during which period she saw him about every two weeks; that on such occasions he sometimes gave her between $15 and $20, depending upon his mood; that during those two years he never gave her more than $300 per year; that after the first two years they did not live together. She admits that it was almost a year after his death when she first heard of it and that the last time she saw him was about six months before his death. Apart from the fact that her own statement discredits her trial testimony as to the extent and period of contribution, it is further weakened by the circumstance that decedent, who appears to have been a devoted son and brother, made substantial contributions for the support of his mother, his sister, and other members of his immediate family, as well as his son.

 Upon all the evidence, the Court finds that the plaintiff contributed to the support of the widow only for two years after the marriage and at the rate of $300 per year; that thereafter they were separated and he made no payments for her support for a period of five years prior to his death. Thus, the question is whether, in the light of the fact that they had been separated and the husband had not made any contribution for her support for a five-year period before his death, nonetheless her status as widow entitles her to an award of damages. The parties were married in New York State, where the widow still resides, and, while the husband apparently spent most of his shore leave between trips in Puerto Rico, it does not appear that the matrimonial domicile was changed. The public policy of New York State prohibits any voluntary release of the husband's duty to support the wife,[8] although they may agree upon a measure of support, consistent with his means and income.[9] Moreover, there is always the prospect of reconciliation, which finds encouragement in the State's policy since separation, no matter what the cause, is not a ground for divorce. And, even if she were the cause of separation, under New York law the wife, in circumstances of need, would have been in a position to compel support had the decedent lived.[10] Thus, essentially the question is whether the deprivation of the right to potential support is pecuniary damage for which she is entitled to compensation, although "at best difficult to estimate."[11] Our Court of Appeals in Civil v. Waterman S.S.Corp.[12] has held in a substantially similar situation that the widow did suffer a financial loss and was entitled to substantial damages. In Diaz v. Lykes Bros. S.S. Co.[13] it reaffirmed its position. In an attempt to distinguish these cases, the defendant points out that, while in the instant case the widow

peake & Ohio Ry. v. Kelly, 241 U.S. 485, 489, 36 S.Ct. 630, 60 L.Ed. 1117 (1916).

8. N.Y.Domestic Relations Law, § 51.

9. Kyff v. Kyff, 286 N.Y. 71, 35 N.E.2d 655 (1941); Goldman v. Goldman, 282 N.Y. 296, 302, 26 N.E.2d 265 (1940).

10. Domestic Relations Court Act of the City of New York, §§ 92, 101; Sternheim v. Sternheim, 174 Misc. 574, 20 N.Y.S.2d 823 (Dom.Rel.Ct.1940).

11. Civil v. Waterman S.S. Corp., 217 F.2d 94, 99 (2d Cir. 1954).

12. 217 F.2d 94 (2d Cir. 1954).

13. 229 F.2d 269, 270 (2d Cir. 1956).

took no affirmative action to assert or enforce her right to support, in Civil she actually attempted to locate her husband and compel support some nineteen years before his death and in Diaz the husband a few years before his death had promised to mend his ways, support his wife and establish a home for her and the children. I do not believe that these are valid distinctions.[14] It is the right to support of which the wife is deprived that represents her damage,[15] although to be sure its measurement should properly take into account past contributions by the husband.[16] Other factors would also come into play, such as the earnings of the husband, the wife's earnings, if any,[17] (here the wife has been and is employed) and the contributions by the husband to his other dependents.[18] Here the husband and wife never established a home of their own; their relationship during the two-year period after the marriage when the decedent did see his wife on shore leave appears to have been more casual than connubial. Orona's interest was centered about his aged mother, his sister and his son in Puerto Rico. Upon this record the conclusion is compelled that the pecuniary damage suffered by the widow is minimal—that the amount he actually contributed, which did not exceed $300 per year, represents a fair yardstick of pecuniary damage. The widow's life expectancy was much greater than that of her husband which, at the time of his death, was twenty-two years. He, however, had already shown signs of mental disorder; some years before his suicide, he had been confined to a mental institution. The Court finds that his work expectancy at the time of his death did not go beyond twelve years, or his sixty-fifth year. The loss to the wife from the date of death to the present, a period of three years at the rate of $300 per year, is $900; the remaining nine years of expectancy at the same rate would amount to $2,700, the present value of which, discounted at 4%, is $2,230,[19] bringing the total to be allocated to the widow to $3,130.

We next consider the damages to be allocated to the son, who was born on April 26, 1947. In this instance, too, the Court finds that the extent of the claimed contribution has been exaggerated. The boy's mother testified that she received direct financial remittances from the decedent for the boy's support for five years before his death at the rate of $1,500 to $2,000 per year—this, in addition to authorized purchases for food from the local grocer not to exceed $40 per month, for which moneys were sent directly by Orona to the grocer. The claimed additional contribution of $1,500 to $2,000 is highly questionable in view of the very substantial support he provided for his mother and the other members of his family, particularly in the light of his limited earnings and the fact that he necessarily required some

---

14. But see, Tweedy v. Esso Standard Oil Co., 190 F.Supp. 437, 442 (S.D.N.Y. 1960), aff'd on other grounds, 290 F.2d 921 (2d Cir.), cert. denied, 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961).

15. See Michigan Cent. R. R. v. Vreeland, 227 U.S. 59, 72, 33 S.Ct. 192, 57 L.Ed. 417 (1913); Wade v. Rogala, 270 F.2d 280, 285 (3d Cir. 1959); Naylor v. Isthmian S.S. Co., 187 F.2d 538, 541 (2d Cir. 1951); Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622, 625 (6th Cir. 1948); Teeters v. Pennsylvania R. R., 118 F. Supp. 385 (W.D.Pa.1954). Cf. Dow v. Carnegie-Illinois Steel Corp., 165 F.2d 777, 779–780 (3d Cir. 1948).

16. Cf. Briscoe v. United States, 65 F.2d 404, 405–406 (2d Cir. 1933).

17. See Domestic Relations Court Act of the City of New York § 92(1) ("having due regard to the circumstances of the respective parties"); Benedict v. Benedict, 203 Misc. 286, 295, 115 N.Y.S.2d 352, 364 (Dom.Rel.Ct.1952).

18. Petition of Gulf Oil Corp., 172 F.Supp. 911, 921 (S.D.N.Y.1959); see Holliday v. Pacific-Atlantic S.S. Co., 117 F.Supp. 729, 733 (D.Del.1953), aff'd, 212 F.2d 206 (3d Cir. 1954).

19. The present value of $1.00 per annum payable at the end of each year for a term of nine years, discounted at 4%, is $7.435.

part thereof for his own maintenance and support. The Court is urged to accept the mother's testimony because it is uncontroverted. However, the trier of the fact is not bound to accept such testimony simply because it is not contradicted, particularly where he has had the opportunity to observe the witness and other relevant factors making its verity questionable.[20] The Court is satisfied that in addition to the $40 per month for food, as to which there is little dispute, the decedent also paid to the boy's mother for his clothing and other necessities an additional sum which did not exceed $300 a year, making a total in all of $780 per year for his support and maintenance. Accordingly, the actual pecuniary loss for the three-year period from the time of death to date is $2,340. The boy is now fifteen years of age and it is probable that during the next six years of his minority some slight increased amount would have been made available to him by the decedent, which the Court finds to be a total of $850 per year, the present value of which, discounted at 4%,[21] is $4,455 which, added to the above actual damage to date, brings the total to $6,795.

The proof also supports some allowance for loss of nurture.[22] The boy, as well as his mother, testified upon the trial. It appears that between sea voyages the father spent time with the boy and was greatly devoted to him. He encouraged him in his studies, counseled him to consider a professional career and guided him with respect to religious matters and observances. The loss of nurture, guidance and training the son would have continued to receive from his father, had he lived, is fixed at the rate of $200 per year during his minority. The infant has already sustained damage for the three-year period to date in the sum of $600; the present value of his loss for the next six years, discounted at 4%, is $1,048; the total award for nurture is $1,648. Thus, the total allocation of the award in favor of the infant son is $8,443.

▋ The administratrix also asserts a claim for conscious pain and suffering. However, the record does not support any award. Plaintiff did not attempt to show how long before decedent was found in a comatose state it was likely that he had taken the poison. The doctor who pronounced him dead could have been questioned or a medical examiner called to express an opinion on the basis of a hypothetical question. For all that appears, draining the contents of the bottle may well have brought instantaneous death.[23]

Judgment shall be entered in favor of the administratrix in the sum of $11,573 to be allocated as hereinabove set forth.

Judgment may be entered only against Isbrandtsen Line, which operated, managed and controlled the vessel at the time of Orona's death.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

20. Cf. Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952).

21. The present value of $1.00 per annum payable at the end of each year for a term of six years and discounted at 4% is $5.242.

22. Norfolk & Western Ry. v. Holbrook, 235 U.S. 625, 629, 35 S.Ct. 143, 59 L.Ed. 392 (1915); Michigan Cent. R. R. v. Vreeland, 227 U.S. 59, 71, 33 S.Ct. 192, 57 L.Ed. 417 (1913); Moore-McCormack Lines, Inc. v. Richardson, 295 F.2d 583, 593 n. 9a (2d Cir. 1961).

23. Cf. Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622, 626 (6th Cir. 1948).