In the Matter of **GULF CANAL LINES, INC.** owner and operator of the **TUG POINT COMFORT.**

**A. D. No. 1881.**

United States District Court
S. D. Texas,
Houston Division.
April 22, 1963.

Baker, Botts, Shepherd & Coates (James K. Nance), Houston, Tex., for petitioner, Gulf Canal Lines, Inc.

Helm, Jones, Pletcher & Winkelman (Albert P. Jones and Shirley M. Helm), Houston, Tex., for claimant-respondent.

HANNAY, District Judge.

This case was originally instituted here by Gulf Canal Lines, Inc., for exoneration from and limitation of liability. Petitioner is the owner and operator of the Tug POINT COMFORT.

Alfred A. Salazar is the Claimant-Respondent in the action, and after the disposition of the question of limitation of liability, this suit became in effect a suit by Salazar against the Petitioner. The Claimant-Respondent will hereinafter be called Salazar. The trial was before the court without a jury. Salazar is suing for damages for loss of wages up to the time of trial, for diminution of his earning capacity from the time of the trial, and for pain and suffering as the result of his injury. As a basis for his claim Salazar alleges negligence on the part of owner-employer and the unseaworthiness of the tug. Maintenance and cure are not here involved.

Petitioner in its answer avers that its vessel was seaworthy and was properly manned, equipped and supplied, and that Salazar's injuries were the result of his own negligence in standing inside the line on the deck on the occasion in question and that this negligence of Salazar was the sole and proximate cause of his injuries and that, therefore, Salazar is not entitled to recover, but in the event that a recovery is allowed, that the award should be substantially less than Salazar claims.

On March 24, 1960, the Tug POINT COMFORT was on a voyage in the Intracoastal Canal between Point Comfort, Texas, and Harbor Island, Texas, traveling in a generally western direction. It was a steel tug of pusher type, 126 feet in length and 24 feet 4 inches in width. As it approached the vicinity of Seadrift, Texas, in San Antonio Bay, while traveling at a rate of speed of about five or six miles an hour, the accident occurred which resulted in Salazar's losing his

right leg about 2½ inches below his right knee.

The tug at the time was transporting six empty barges. It was manned by an eight-man crew, consisting of Captain Denais and Mate McElroy, Chief Engineer Guyuska, another engineer Sherill, a cook Blackman, and three deckhands Nelson, Williams and Salazar.

At the time of the accident the captain was steering the tug and only Nelson and Salazar were on deck. The Intracoastal Canal at the place of the mishap was about 150 feet in width and only about 12 or 13 feet deep. The wind at the time was blowing about 20 miles per hour and was striking the empty barges broadside. Partially blocking the narrow channel was the dredge boat HOLLAND. This situation caused the captain to attempt a maneuver known as "popping the whip" in an effort to prevent a collision with the dredge boat.

Salazar, only nineteen years of age and with meager experience of one week on a shrimp boat and four days on the tug, was selected to handle the lines. He had not been instructed in his duties by either the captain or the mate, and the Safety Rules posted contained, among its 39 cautions, No. 13—"Do not stand in a bight of a line at any time." The line was a manila rope described by the captain as being 9 inches in circumference and 2¼ inches in diameter. The line had been broken at about 6:15 a. m. that same morning. When the "popping the whip" operation began, the captain repeatedly commanded Salazar to "hurry up." This naturally resulted in tension and confusion on Salazar's part. The maneuver resulted in either avoiding the dredge boat or striking it but lightly and the POINT COMFORT was abruptly grounded, resulting in a lurch which caused Salazar's right leg to get inside the line or loop or bight which severed his right leg as before stated. The defective rope broke again at this time as Salazar was attempting to get the line around the bitt as quickly as he could.

There was a layer of red bauxite dust on the deck. This became slippery when wet. It is logical to assume, considering the velocity of the wind, that water did get upon the deck resulting in its becoming slippery.

The questions presented for decision are:

A. Was the POINT COMFORT seaworthy on the occasion in question?

B. Was the POINT COMFORT guilty of negligence?

C. Was Salazar contributorily negligent?

D. What damages, if any, were caused to Salazar?

A. Considering the question of the seaworthiness of the shipowner. It is beyond dispute that the shipowner has an absolute duty to furnish a seaworthy vessel. (See Cox v. Esso Shipping Co., 5 Cir., 247 F.2d 629.) Unquestionably, the rope that broke twice on the morning of March 24, 1960, was inadequate and unfit for the intended use. This rendered the tow line unseaworthy. The leading case of Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 supports the position of Salazar on the question of unseaworthiness. This, too, involved the breaking of a piece of defective rope. The opinion of Chief Justice Stone on that point reads as follows:

"The staging from which petitioner fell was an appliance appurtenant to the ship. It was unseaworthy in the sense that it was inadequate for the purpose for which it was ordinarily used, because of the defective rope with which it was rigged. Its inadequacy rendered it unseaworthy, whether the mate's failure to observe the defect was negligent or unavoidable. Had it been adequate, petitioner would not have been injured and his injury was the proximate and immediate consequence of the unseaworthiness. See The Osceola, supra [189 U.S. 158 at pages], 174–175 [23 S.Ct. 483 at pages 486, 487, 47 L.Ed. 760], and cases cited."

To the same effect is the comparatively recent case of Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 which reiterates and reaffirms the doctrine as set forth in the Mahnich case, supra.

From the above it is perfectly plain that Salazar's injury was directly and proximately caused by the unseaworthiness of the tug.

■ B. I further find as a matter of fact, by a preponderance of the credible evidence, and as a matter of law, that Petitioner was guilty of negligence in the following particulars, among others:

1. The captain did not ascertain Salazar's lack of qualifications and inexperience.

2. The captain did not instruct Salazar as to his duties or have the mate McElroy do so.

3. The captain did not warn Salazar of the danger of running aground.

4. The captain was negligent in attempting to "pop the whip" with the tow of six empty barges in the narrow shallow channel when the wind was blowing so that it struck the barges broadside and with the dredge boat partially blocking the canal.

5. Attempting to "pop the whip" when the captain already knew of the condition of the defective rope.

6. Having the least prepared of his crew (Salazar) doing the most difficult and dangerous work in such maneuver.

7. Instead of giving any helpful instructions to Salazar, order him to "hurry up."

8. Failing to furnish Salazar with a safe place to work. Under all the circumstances, this duty was not one that could be delegated.

On the question of negligence of the shipowner where a young, inexperienced, and uninstructed green hand, 24 years of age, was injured, see Davis v. Parkhill-Goodloe Co., 302 F.2d 489, decided by the Fifth Circuit, 1962, in the very able opinion written by Judge Brown. He wrote (in addition to holding that the instructions should have been positive and plain, which they were not in the case we are now considering) and I quote:

"Whatever a shipowner might be permitted to do with respect to seasoned hands familiar with the peculiar hazards of the sea, it is plain that it could not absolve itself of the pervading obligation to furnish a seaworthy vessel and exercise a prudent care for seamen by leaving this important decision—to wear or not wear a life vest?—up to this inexperienced, untrained farm boy who had not yet begun to get his sea legs. This is but the application of the familiar principle of salt water, amphibious and land-locked jurisprudence that there is a duty to warn in an effective way of dangers not reasonably known, Pioneer Steamship Co. v. Hill, 6 Cir., 1955, 227 F.2d 262, 264, 1955 A.M.C. 1617, and a duty to take effective action in the light of the particular condition—here inexperience and ignorance of seagoing perils—of the particular seaman, Justilian v. Versaggi, S.D.Tex.1954, 169 F.Supp. 71; Reck v. Pacific-Atlantic Steamship Co., 2 Cir., 1950, 180 F.2d 866, 1950 A.M.C. 744; McDonough v. Buckeye S.S. Co., N.D.Ohio, 1951, 103 F.Supp. 473, affirmed, 6 Cir., 1952, 200 F.2d 558; Tetterton v. Artic Tankers, Inc., E.D.Pa., 1953, 116 F. Supp. 429. This was a basic fault on the part of the shipowner."

The above mentioned acts of negligence on the part of the Petitioner singularly and collectively were direct and proximate causes of the injury to Salazar.

C. On the question of contributory negligence, in the case of Page v. St. Louis Southwestern Railway Co., 312

F.2d 84, 5th Cir., Judge Rives discusses at length this question of contributory negligence and proximate cause. He states that the standard of liability under the Jones Act is governed by the substantive provisions of the Federal Employers' Liability Act. 46 U.S.C.A. § 688. Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523, 77 S.Ct. 459, 1 L.Ed.2d 515. The Page case, supra, quotes from Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 77 S.Ct. 443, I L.Ed.2d 493 as follows:

"Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest,* in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's *contributory negligence.* Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played *any* part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part*' to its negligence." (Emphasis supplied)

The burden of proving contributory negligence is, of course, upon the Petitioner. This burden was not met. Petitioner in an attempt to make proof of contributory negligence urges two points: First, that Salazar had been instructed as to his duties by deckhand Nelson. Such instructions were inadequate and ineffectual. In the case of Yates v. Dann, D.C., 124 F.Supp. 125, at page 127, the Court held:

"It is a duty of a *captain* or *mate* to instruct men regarding their duties on tugs." (Emphasis supplied)

This was a case where a deckhand was injured who had had some twelve years experience around water.

The other point urged by Petitioner as showing contributory negligence was the posting of the Safety Rules. These rules were printed on a cardboard approximately 2 feet long and 1½ feet wide and contained 39 of the rules. Number 13 reads as follows:

"Do not stand in a bight of a line at any time." Salazar did not know until after he was injured what *bight* meant. This caution should have, under the Davis case, supra, been written in plain and positive language. The Davis case further requires effective action in the light of the particular condition—here inexperience and ignorance of seagoing perils—of the particular seaman. In the instant case the rules fall far short of this requirement.

Viewing the evidence as a whole, the Court is of the opinion that Salazar was not guilty of any contributory negligence since no act or omission of his proximately caused or contributed to cause the mishap.

D. Turning now to the question of damages, the injury received by Salazar was severe and permanent. At the time of his injury he was nineteen years of age. He was normal, healthy, ambitious, and of good habits. He had terminated his education in the tenth grade of high school. He had worked on a farm and in stores before the date of his attempting to go to sea. He was married in March of 1959 and at the time of trial had two children ages, respectively 1 and 2 years. Immediately after the accident he was in excruciating pain and had to be restrained to keep him from leaping overboard into the water.

He remained on board the POINT COM-FORT for about thirty minutes during which time no pain relieving medicines were administered to him, then he was taken by speed boat to the hospital at Seadrift which journey took about thirty minutes. He remained in the hospital from the date of his mishap until April 15, 1960, and was again hospitalized from April 27 to July 6, 1960. Six operations were performed on his leg and he still suffers pain from the remaining portion of his right leg.

At the time of his injury he was earning $17.11 per day and, in addition, was given his meals and sleeping quarters while on board ship. It is estimated that deckhands work on an average of twenty days per month. His life expectancy was 47.43 years and his work expectancy was about 44 years. Since his injury, Salazar has decided to become a barber, and it is in evidence that he would probably earn about $2,000.00 a year in such a vocation. The wages of a deckhand have increased since Salazar's accident. Salazar liked working on ships and would have continued to do so had he been able to.

Before his injury Salazar was athletic and enjoyed various sports. Since this injury, his activities in that respect are greatly lessened. Also his ability to do heavy physical work is ended. Of course, he can never again work as a seaman. Salazar obtained an artificial limb in March 1961 but has not been able to wear it with much comfort.

Since there was no contributory negligence on the part of Salazar, the Court has made no diminution of damages because of that allegation.

The Court realizes as was said by the Second Circuit in the case of Alexandervich v. Gallagher Bros. Sand & Gravel Corp., 2 Cir., 298 F.2d 918, at page 921:

"There is no method of calculating precisely how much of a man's earning capacity will be impaired in the distant future. This is a disputed issue of fact. On review it is enough that this Court finds substantial evidence to support a reasonable estimate. Carroll v. United States, 133 F.2d 690, 694 (2d Cir., 1943)."

I find as a fact that the damages sustained by Salazar were a direct and proximate result of the shipowner's failure to furnish and maintain a seaworthy vessel and because of its negligence hereinabove set out to be as follows:

a. For loss of wages from the date of injury to the date of trial— $ 5,000.00

b. For physical pain and suffering and mental anguish, past, present, and future— 25,000.00
See Blanco v. Phoenix Compania De Navegacion, S.A., 4 Cir., 304 F.2d 13 and Aivaliotis v. S. S. Atlantic Glory, D.C., 214 F.Supp. 568. In the Aivaliotis case $115,000.00 was awarded for injuries sustained by a 19-year old deckhand for permanent injuries involving amputation of his right leg just below the knee.

c. For loss of earning capacity from date of trial and in the future, present cash value— 50,688.00

Total $80,688.00

In summary I find as a fact and conclude as a matter of law that Salazar, as a direct and proximate cause of Petitioner's failure to furnish him a seaworthy

# 440

vessel upon which to work and because of Petitioner's negligence as set forth under "B" above, and because Salazar was not guilty of any contributory negligence on the occasion in question, is entitled to recover and is hereby awarded from Petitioner damages in the sum of $80,688.00 as itemized above, with interest at the rate of six per cent per annum from this date until paid.

Costs of court are charged against the Petitioner.

The foregoing is and constitutes the Court's findings of fact and conclusions of law herein.